42 N.J. Super. 110 (1956)
125 A.2d 884
LEON BAUER, MAX BAUER AND IRVING EISEN, ETC., PLAINTIFFS-APPELLANTS,
v.
141-149 CEDAR LANE HOLDING CO., INC., A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1956.
Decided October 15, 1956.
*112 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Herbert A. Chary argued the cause for appellants.
Mr. George F. Losche argued the cause for respondent (Messrs. Losche & Losche, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs sued defendant landlord for damage to their personal property when water entered the basement of the leased premises during hurricanes "Edna" and "Connie" on September 11, 1954 and August 13, 1955, respectively. There was a jury trial, and at the close of all the testimony the Law Division judge granted defendant's motion for involuntary dismissal as to all counts of the complaint. Judgment of involuntary dismissal, with prejudice, was entered in defendant's favor, with costs. Plaintiffs appeal.
Plaintiffs have not included in their brief "a concise chronological statement, in narrative form, of all the facts which *113 should be known in order to determine the points in controversy," as required by R.R. 1:7-1(d), 2:7-1. Defendant supplies the deficiency in its brief. We find the statement to be a full and fair resume of the operative facts, and plaintiffs concur therein.
Defendant is the owner of 141-149 Cedar Lane, Teaneck, N.J., consisting of five stores with separate basements, the foundation being constructed of cinder block. In September 1950 plaintiffs Max Bauer and Irving Eisen, doing business as Bergen Medical Supply Co. (plaintiff Leon Bauer joined the firm in February 1951), entered into a lease with defendant for 147 Cedar Lane. They stored their merchandise in the basement on platforms at least seven inches high  a practice followed when, as will shortly be noted, they also leased the adjoining store at No. 145. None of the merchandise on these platforms was ever damaged by water except at the time of the two hurricanes. Plaintiffs testified there was dampness and wetness in the cellar of No. 147 from the very first, the water coming from the north or rear foundation wall. They notified Mr. Then, the landlord's president and agent, of the condition, and he arranged to have one Krais examine the premises and suggest what could be done. Krais recommended that the north wall, as well as ten feet of the west wall immediately adjoining, be given a coat of waterproofing compound. This was done, but according to plaintiffs it did not improve the condition. Water seepage and dampness continued.
On May 1, 1952 plaintiffs entered into a lease for not only No. 147 but the adjoining store at 145 Cedar Lane, for a term of five years, the premises to be used and occupied as a retail store for the sale and rental of surgical supplies, drugs and professional office equipment, and for a clinical laboratory. We reproduce the two lease provisions pertinent to this appeal:
"14th: It is expressly agreed and understood by and between the parties to this agreement, that the Landlord shall not be liable for any damage or injury by water, which may be sustained by the said Tenant or other person or for any other damage or injury *114 resulting from the carelessness, negligence, or improper conduct on the part of any other Tenant or Agents, or Employees, or by reason of the breakage, leakage, or obstruction of the water or soil pipes, or other leakage in or about the said building."

* * * * * * * *
"34. The landlord agrees to waterproof the basement of No. 145 Cedar Lane."
The lease was on a standard printed form, except for paragraph 34. The testimony was that during negotiations for the lease plaintiff Max Bauer asked Then if defendant would waterproof the north basement wall of No. 145 to insure against dampness, just as had been done in No. 147. He agreed and, at Bauer's request, inserted the waterproofing clause in the lease.
In July 1952 defendant had Krais paint the basement wall of No. 145 with the same waterproofing compound he had used before. The cellars nonetheless continued to be damp and wet after each rain. The worst condition occurred at the end of 1952 when some three to four inches of water covered the basement floors. It came into No. 145 from No. 143, through the base of the cellar wall separating the stores; some seeped down the rear walls of Nos. 145 and 147, and a little entered No. 147 through the wall separating it from No. 149.
In March 1953 a sump pump was installed in the cellar of No. 149, occupied by another tenant, but whether this was done at the instance of Max Bauer or the tenant is not clear from the record. The installation was by one Greco, an independent contractor. At about this time Rainbow Cleaners, the tenant in No. 143, had a sump pump installed in its cellar, defendant paying the bill. Despite all this, there was still water in the cellar, but the worst condition encountered (until the hurricanes came) was no more than half an inch or so.
The next event of note was the macadamizing of the dirt-surfaced area in the rear of the five stores in June 1954. The tenants had asked defendant to do something about making the lot usable for parking. Mr. Then gave the work to Di Torento Bros., who graded the lot, raised the sills in *115 back of the stores, filled the areaways of Nos. 145, 147 and 149, installed a dry well to the rear of the area, ran an underground drain connecting the leader on the northwest corner of the building (No. 149) to the storm sewer in the street, and then macadamized the lot. It had also been planned to close up the areaway in back of No. 143, but the tenant, Rainbow Cleaners, would not give permission because fire department regulations required that it be kept open on account of the dry cleaning machinery and boiler on the premises.
Plaintiffs' basement continued to be wet and damp, and they told Then about this at the close of August 1954. He found himself at a loss to explain how water could get in after all that had been done, but volunteered to do what he could to straighten out the situation. He at once wrote to three waterproofing contractors to examine the premises, tell him what could be done, and submit estimates.
Before the estimates could come in, hurricane "Edna" struck. Plaintiffs had warning of the imminent storm the day before, and hastened to place the merchandise stored in the cellar on the platforms, where water had never before reached. Heavy rains during the night flooded the entire macadamized area. The waters streamed down the areaways of Nos. 141 and 143 and the vent behind No. 143 into the cellars, worked their way through the wall of No. 143 into the cellar of No. 145, and overflowed the platforms, reaching a depth of three feet and damaging the merchandise.
Shortly after the storm defendant had Modern Plumbing Company, which had submitted a favorable estimate, put a gully along the north wall of the cellars, running from No. 143 through No. 149, and install a sump pump in No. 147 to take the water out of the gully.
On August 12, 1955 plaintiffs, warned of impending storm, took the same precautions as they had with hurricane "Edna." Again they placed their merchandise on the cellar platforms. On August 12 and 13 hurricane "Connie" deluged the area with a total of over six inches of rainfall. The waters flooded the macadamized area and entered plaintiffs' cellars in the *116 same manner as before, to a depth of two and one-half to three feet, with resultant damage to the merchandise.
Plaintiffs' waterproofing expert testified that he knew of no waterproofing paint that would work, that only waterproof plaster would do the job, and that the various steps taken to alleviate the condition  sump pumps and all  were not adequate to keep water from entering the basement. Another expert stated that water flowing through the leaders on the rear of the stores would run toward the building instead of away from it; that the pitch at the west end of the macadam area was toward No. 149, the pitch at the east end being slightly away from the building  but so slight that the wind could blow the water, and that the rest of the area was approximately level.
The complaint is in eight counts. The first and fifth, charging negligence in making repairs to the outside of the building, are not involved in this appeal. The second and sixth alleged that defendant was negligent in waterproofing the basement of No. 145. The third and seventh charged defendant with breach of the waterproofing covenant relating to No. 145. Finally, the fourth and eighth stated that at plaintiffs' request defendant made repairs to correct "a defective condition" which caused the basement to be flooded in rainstorms, and that defendant negligently performed its voluntary undertaking, with the result that on September 11, 1954 and August 13, 1955 floods of water entered the basement and caused extensive damage to a large amount of their merchandise and personal property.
The extensive legal argument developed in plaintiffs' brief to support their claim that the exculpatory clause of the lease (paragraph 14) does not immunize the landlord from liability for breach of its covenant to waterproof the basement of 145 Cedar Lane (paragraph 34), or from liability for negligent performance of that contractual duty, is no longer of moment. (As to the legal effect of such exculpatory clause, see the recent cases of Kuzmiak v. Brookchester, Inc., 33 N.J. Super. 575 (App. Div. 1955), and Freddi-Gail, Inc. v. Royal Holding Corp., 34 N.J. Super. 142 (App. Div. *117 1955); and 175 A.L.R. 8, 83 (1948), 84 A.L.R. 654 (1933), 15 A.L.R. 971, 974 (1921), and 15 U. of Pitt. L. Rev. 493, 501 (1954), 15 Temple U.L.Q. 427 (1941), 42 Yale L.J. 139 (1932-1933), and 6 Williston on Contracts (rev. ed. 1938), § 1751C, p. 4968.) During oral argument plaintiffs' counsel agreed with the view expressed from the bench, based upon the testimony in the case, that the understanding of the parties had been that defendant would waterproof the cellar of No. 145 Cedar Lane in exactly the same way as No. 147; that this was the purpose of paragraph 34 of the lease, and that the landlord's duty had been discharged when Krais painted the rear cellar wall of No. 145 with the same waterproofing compound as he had used on the rear wall of No. 147. Counsel admitted that he could therefore no longer rely on the second and sixth counts charging negligent performance of the waterproofing covenant, or on the third and seventh counts based upon breach of that covenant, and was accordingly abandoning them.
We deal, then, with the fourth and eighth counts alleging a voluntarily assumed duty by defendant to correct the condition which caused the basement to be flooded in rainstorms, and its alleged negligent performance of this voluntary undertaking. Defendant argues that it must be absolved from responsibility because it employed independent contractors to do all the work complained of; that at no time did it or its agent Then supervise, direct or control the work, but that the contractors exercised exclusive supervision and control, citing Mann v. Max, 93 N.J.L. 191 (E. & A. 1919), and Kahn v. King Petroleum Corp., 13 N.J. Super. 334 (App. Div. 1951). Neither the pleadings nor the pretrial order raised this defense, and defendant may not ask us to deal with it merely because it was advanced as one of the arguments made at the very end of the case, in support of its motion to dismiss the complaint. Scatuorchio v. Jersey City Incinerator Authority, 14 N.J. 72, 94 (1953); Hollister v. Fiedler, 22 N.J. Super. 439, 448 (App. Div. 1952); and see Schnitzer and Wildstein, N.J. Rules Service, annotation to R.R. 4:15-2, and particularly sec. 8, *118 p. A-IV-386 ff. As to the responsibility of a landlord who entrusts repairs to an independent contractor, see generally Prosser on Torts (2d ed. 1955), § 80, p. 476.
Although it is argued that defendant landlord is not liable for its allegedly negligent performance of a voluntarily assumed duty to correct the water condition through installing sump pumps, raising the sills, putting a gully next to the rear basement wall, and the rest, because of paragraph 14 of the lease, we do not resolve the problem on the basis of the exculpatory clause. The insulation against liability which such a clause may provide for the landlord is fully explored in Kuzmiak v. Brookchester, Inc., 33 N.J. Super. 575 (App. Div. 1955) and Freddi-Gail, Inc., v. Royal Holding Corp., 34 N.J. Super. 142 (App. Div. 1955), above. Exculpatory clauses are closely scanned and generally strictly construed against the landlord, largely for the reasons stated in the cases cited in Freddi-Gail  that authorities look with disfavor upon any possible attempt by a landlord to secure exoneration from his own wrongdoings. Paragraph 14 of the lease under consideration is exactly like that considered in the Freddi-Gail case; the landlord was not to be liable for "damage or injury resulting from the carelessness, negligence, or improper conduct on the part of any other Tenant or Agents, or Employees, * * *." This court held in Freddi-Gail (34 N.J. Super., at page 144) that there was nothing in the clause which could be said in any way to advert to the landlord's negligence, except the words "Agents, or Employees," and that it was not clear whether these words referred to the landlord's agents and employees or to those of other tenants. Since the clause did not in plain terms exonerate the landlord from its own acts of negligence, it did not bar plaintiff's claim. We adopt that view.
The lease put defendant under no obligation to do anything more than waterproof the rear wall of No. 145 to correct the condition of dampness and wetness in the basements of plaintiffs' stores.
It is often broadly stated that where a tenant informs the landlord of a defective condition, and the landlord voluntarily *119 undertakes to correct that condition, he is liable for injuries resulting from the negligent manner in which the work was done. See, for example, Caruso v. Monschein, 24 N.J. Super. 55, 58 (App. Div. 1952), and see annotation, 150 A.L.R. 1373 et seq. (1944). It has been said that the lessor's liability rests not upon his standing in the relation of landlord and tenant, but rather on his course of affirmative conduct endangering the tenant. Prosser on Torts (2d ed. 1955), § 80, p. 476, and § 38, pp. 186-187. But the rule of liability should, in the light of the more recent cases and authorities, be more carefully stated. In most of the cases where the landlord has been held liable for repairs voluntarily undertaken, he has either made the situation worse by increasing the danger, or has given the tenant a deceptive assurance of safety by leading him to believe that the situation has been corrected, or has induced him to forego the possibility of help from other sources. See Prosser, op. cit., § 80, notes 43 and 44, and § 38, p. 187, note 88. We consider the correct statement of the rule is that given in 2 Restatement of Torts, Negligence (1934), § 362, p. 982:
"A lessor of land who, by purporting to make repairs thereon while the land is in the possession of his lessee or by the negligent manner in which he has made such repairs has, as the lessee neither knows nor should know, made the land more dangerous for use, is subject to liability for bodily harm caused thereby to the lessee and others upon the land with the consent of the lessee or a sub-lessee."
Comment (a) to section 362 states that the rule applies if the negligent manner in which the repairs are made "makes the land more dangerous for use, irrespective of whether the added danger is due to the fact that the physical condition of land is changed for the worse by the repairs or to the fact that the making of the repairs gives it a deceptive appearance of safety and so leads the tenant or others with his consent to use the land in a way which but for the repairs they would recognize to be dangerous." And see Bohlen, Studies in the Law of Torts (1926), p. 212, note *120 13 and p. 224, note 28; Kirshenbaum v. General Outdoor Adv. Co., 258 N.Y. 489, 180 N.E. 245, 84 A.L.R. 645 (Ct. App. 1932).
The Restatement rule has no application in the circumstances of this case. Defendant never assured plaintiffs that the sump pumps, raised sills, gully or macadamized area would eliminate dampness or water in the basements. Not only that, but plaintiffs were quite aware that what the landlord had done did not correct the condition, because it persisted after each corrective step had been taken. In short, the basements were not made more dangerous for use, there was nothing in defendant's conduct which gave plaintiffs the assurance that further leakage would not occur, and there is nothing in the record which indicates that whether such assurance was or was not given, plaintiffs placed any reliance upon it.
Where, as here, the landlord in good faith and beyond his lease obligation voluntarily undertook to correct the water condition, it would be illogical and inequitable to say that his risk of liability increased in direct proportion with every effort made further to improve the situation, where what the landlord did neither made that situation worse by increasing the danger, nor misled the tenant into a deceptive assurance of safety, nor induced him to forego the possibility of help from other sources. Such a result, moreover, would discourage remedial action by the landlord, of the sort which took place in the instant case, by attaching a peril of liability not theretofore existent.
There is another reason why the Law Division judgment must be upheld. Even if it be assumed, arguendo, that defendant negligently performed the corrective repairs which it voluntarily undertook, plaintiffs still have the burden of establishing that the actual damage for which they here sue was the natural and proximate result of the negligence. At most, all they have shown is that defendant undertook to prevent or minimize water leakage by the indicated measures. No jury could find that these measures were in any way the cause of the damage plaintiffs sustained. *121 All they have proved is that the landlord tried, above and beyond his obligations under the lease, to apply preventive measures for the type of water seepage which had previously taken place, which was never more than two or three inches deep or ever (except for the hurricanes) reached the top of the platforms, and that such measures were not effective to prevent the flooding of the basements to a depth of three feet because of hurricanes "Edna" and "Connie." The hurricanes were an extraordinary act of nature, not reasonably to be guarded against. In our opinion, there simply was no causal or proximate relationship between defendant's alleged negligence and the particular damage for which recovery is sought.
We do not agree with the reasons assigned by the trial judge for entering the judgment he did. Appeals, however, are taken from judgments and not from opinions. Hughes v. Eisner, 8 N.J. 228, 229 (1951). We are interested in the propriety of the action appealed from, rather than in the reasons advanced by the trial court in support thereof. State v. LeFante, 14 N.J. 584, 590 (1954). The judgment is not vitiated merely because that court may have applied erroneous legal principles to a resolution of the case. R. Krevolin & Co., Inc., v. Brown, 20 N.J. Super. 85, 92 (App. Div. 1952); Taneian v. Meghrigian, 27 N.J. Super. 177, 182 (App. Div. 1953), reversed on other grounds, 15 N.J. 267 (1954); Giumarra v. Harrington Heights, Inc., 33 N.J. Super. 178, 193 (App. Div. 1954), affirmed o.b. 18 N.J. 548 (1955).
Affirmed.