LEON BAUER, MAX BAUER AND IRVING EISEN, *ETC.*, PLAINTIFFS-APPELLANTS, v. 141–149 CEDAR LANE HOLDING CO., INC., A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued March 4, 1957—Decided April 8, 1957.

*Mr. Herbert A. Chary* argued the cause for the appellants.

*Mr. George F. Losche* argued the cause for the respondent (*Messrs. Losche & Losche,* attorneys).

The opinion of the court was delivered by

VANDERBILT, C. J.   This appeal focuses our attention on the rule of liability where a landlord voluntarily undertakes to correct a defective condition in leased premises. There were other questions raised by the case, but they were abandoned on the appeal to the Appellate Division of the Superior Court; see 42 *N. J. Super.* 110, 116, 117.   Upon the affirmance of the final judgment of involuntary dismissal in favor of the defendant in the Appellate Division, the plaintiffs petitioned the Supreme Court for certification pursuant to *R. R.* 1:10–2, asserting as the reasons for the granting of such relief that the Appellate Division had restricted the rule as to a landlord's liability beyond any judicial decisions in New Jersey and had, in light of the decisional law in this State, erred in holding that hurricanes were an extraordinary act of nature, not reasonably to be guarded against in the correction of the defect gratuitously undertaken.   We granted the petition for certification, 23 *N. J.* 58 (December 10, 1956).

The factual details are fully set forth in the opinion below in 42 *N. J. Super.* 110; we sketch them only briefly.

The defendant is the owner of five stores at 141–149 Cedar Lane, Teaneck, N. J.   Each store has a separate basement constructed of cinder cement blocks.   In September 1950 the plaintiffs became tenants of the store at No. 147 Cedar Lane and conducted a medical supply business there.   They had trouble with water in the basement from the beginning of their occupancy and consequently stored the merchandise which they kept in the basement on platforms raised about seven inches from the floor.   After they had endured this condition for about a year the land-

lord voluntarily undertook to alleviate it and had one base-
ment wall and part of another painted with a waterproofing
compound, but the flooding continued.

In May 1952 the plaintiffs entered into a new lease with
the defendant covering premises No. 147 and the adjoining
store at No. 145 Cedar Lane. In this lease the landlord
agreed "to waterproof the basement of 145 Cedar Lane."
This was done in July of 1952 with the same waterproofing
compound used in the basement of No. 147. It was con-
ceded on the oral argument below that the landlord had
fully discharged the obligation imposed upon it by the
agreement to "waterproof the basement of 145 Cedar Lane."
The flooding continued, but never to such an extent that
it rose above the height of the platforms upon which the
plaintiffs' goods were stored until the hurricanes of Sep-
tember 11, 1954 and August 13, 1955.

Before those events, however, the landlord paid the cost
of installation of one or two sump pumps in the basements
of the stores adjoining the plaintiffs' stores on the east
and on the west. It was from these directions that most of
the water came during the worst flooding that had occurred
prior to the hurricanes. The landlord then paved the area
to the rear of the stores, but the flooding still continued.

The landlord voluntarily undertook to obtain estimates
from waterproofing contractors to alleviate the condition
but before the estimates were received the hurricane of
September 1954 struck with all its fury causing a flooding
of the macadam parking area. The water this time flowed
down the vents and areaways to the cellars of the stores
east and west of the plaintiffs' stores, seeped through the
dividing walls and built up to a depth of three feet in the
plaintiffs' basements and damaged their goods.

After that storm the landlord had a trough constructed
at the rear of its five stores to intercept the water that
might be inclined to flow into the basements through the
vents and areaways and installed another sump pump in
plaintiffs' store No. 147 to pump that water away.

On August 12, 1955 the plaintiffs, upon learning of the threat of another hurricane, took only "the same precautionary measures" as they had in the past, namely, kept their merchandise on seven-inch platforms, but water entered the same way as before.

The plaintiffs brought suit against the landlord for the damages suffered in the flooding during the two storms alleging in their complaint, as amended, four counts relating to each incident. The trial court dismissed the first and fifth counts at the end of the plaintiffs' case. At the end of the entire case the trial court took the case from the jury and granted an involuntary dismissal in favor of the defendant. On appeal all counts were abandoned with the exception of the fourth and eighth counts which alleged a negligent performance of a voluntary undertaking by the landlord at the request of the plaintiffs to correct a defective condition which causes their basements to be flooded with water.

The Appellate Division of the Superior Court affirmed the dismissal, but for different reasons than those assigned by the trial court for its action. It held that there could be no recovery by the plaintiffs because the landlord had not made the basements more dangerous for use nor had it assured the plaintiffs that further flooding would not occur and that the plaintiffs had not in fact relied on any such assurance and because there was no causal or proximate relationship between any alleged negligence on the part of the landlord and the particular damages suffered by the plaintiff.

Our consideration is limited to whether or not there was a proper dismissal of the two counts alleging liability for damage resulting from the negligent performance of a voluntary act.

The plaintiffs contend that the landlord is liable for the damage suffered by them without regard to whether the "negligence has made the premises more dangerous for use." They say that the common-law rule followed in this State makes a landlord unqualifiedly liable for damages if

the work he voluntarily undertakes to perform on the leased premises is negligently done and results in injury; they say the "more dangerous for use" doctrine set forth in 2 *Restatement of the Law of Torts, Negligence* (1934), sec. 362, *p.* 982, has never been adopted and followed in New Jersey. To meet the reasoning of the Appellate Division the plaintiffs urge that in the making of repairs under the conditions here "There is an implied assurance * * * that they will be and were properly done, and that the previous defective condition will be and was remedied." They also urge the landlord is not excused from liability here where its negligence joined with an act of God produces the injury. The plaintiffs' final assertion is that the landlord is also not excused from answerability for the negligent performance of the repairs even though the particular consequences were not foreseen.

The defendant applauds the salutary nature of the *Restatement* rule. It asserts that the plaintiffs have not charged the landlord with negligence in the work which was actually performed but merely complain that the landlord did not do enough and, since there is no liability on the landlord's part for nonfeasance, it cannot be held liable here for not doing enough. In addition to seeking to uphold the determination of absence of proximate cause in the Appellate Division, the defendant affirmatively argues that since it hired independent contractors to do the work and let it to the exclusive supervision and control of such contractors it was absolved from any liability.

The arguments advanced by the plaintiffs generally assume the existence of negligence on the part of the defendant. We, therefore, consider that crucial question because in the absence of any negligence on the part of the landlord it does not matter whether the hurricanes were an extraordinary act of nature, or whether they were an efficient concurring cause of the damage to the goods of the plaintiffs, or whether there was a proximate causal relationship between the alleged negligence and the particular damages suffered, or whether the hiring of an independent contractor absolved

the defendant of all liability; for unless there is negligence there is no liability.

█ In the absence of an agreement to do so, a landlord is under no obligation to a tenant to make repairs to remedy defects in the leased premises that either existed at the beginning of the tenancy or developed thereafter, *Grugan v. Shore Hotels Finance & Exchange Corp.,* 126 *N. J. L.* 257, 259 (*E. & A.* 1940); *Harenburg v. August,* 119 *N. J. L.* 83, 85 (*E. & A.* 1937); *Naumberg v. Young,* 44 *N. J. L.* 331, 345 (*Sup. Ct.* 1882), and is ordinarily not liable to the tenant for damage resulting to his property from such defects in the premises, *Briggs v. Pannaci,* 106 *N. J. L.* 541 (*E. & A.* 1929). The lease in effect between the parties here admittedly did not include or contemplate any duty or obligation or liability different from that governing in the absence of specific agreement. The only covenant concerning repairs relative to the issue has concededly been performed and satisfied.

█ But while there may be no liability for failure on the part of a landlord to act with respect to such defects, the same exemption does not follow him when he undertakes voluntarily to perform a repair. In this instance the rule generally is that he is obligated to perform the work in a reasonably careful manner and is liable in damages for his failure to do so, *Grugan v. Shore Hotels Finance & Exchange Corp., supra,* 126 *N. J. L.* 257, 259 (*E. & A.* 1940); *La Brasca v. Hinchman,* 81 *N. J. L.* 367 (*Sup. Ct.* 1911). In the *La Brasca* case we are told:

"The principle of liability involved received its first notable application in the famous adjudication of *Coggs v. Bernard* (1703), 2 Ld. Raym. 909, where Lord Holt gave expression to the doctrine of misfeasance as applied to the dereliction of a mere volunteer, and this doctrine has since found application in various phases of tort-feasance. In that case the bailee undertook to carry the hogsheads of wine as a mere volunteer, and did it so negligently that damage resulted. Liability was not predicated upon a contractual relationship, nor upon the interposition of a consideration or benefit accruing to the bailee, but upon the common law doctrine that one who undertakes to perform an act, and performs it negligently, whereby damage results, is liable for his misfeasance."

Chancellor Kent in *Thorne v. Deas,* 4 *Johns* 84 (*N. Y.* 1809) speaking of the rule says:

"By the common law a mandatory or one who undertakes to do an act for another without reward, is not answerable for omitting to do the act, and is only responsible when he attempts to do it, and does it amiss. In other words, he is responsible for a misfeasance, but not for a non-feasance."

See also the cases collected in the annotation in 150 *A. L. R.* 1373, entitled "Landlord's liability for injury to person or damage to property as affected by his making of repairs in absence of obligation to do so."

In the present-day application of the doctrine as applied to voluntary repairs by a landlord the cases have recognized two distinguishing features, the presence and absence of which appears to affect the ultimate liability. They are: (1) whether the condition which the landlord has undertaken to repair has been made more dangerous than it was in its original state, and (2) whether the tenant placed any reliance upon the repair made by the landlord or was deceptively induced into a false sense of security, *Prosser on Torts* (*2d ed.* 1955), 476.

The *Restatement* view is that:

"A lessor of land who, by purporting to make repairs thereon while the land is in the possession of his lessee or by the negligent manner in which he has made such repairs has, as the lessee neither knows nor should know, made the land more dangerous for use, is subject to liability for bodily harm caused thereby to the lessee and others upon the land with the consent of the lessee or a sublessee." *Restatement of the Law of Torts, Negligence, sec.* 362, *supra.*

The distinguishing features are made more apparent by the comments following the *Restatement* of the above rule:

"a. The rule stated in this Section applies if the negligent manner in which the repairs are made makes the land more dangerous for use, irrespective of whether the added danger is due to the fact that the physical condition of land is changed for the worse by the repairs or to the fact that the making of the repairs gives it a

deceptive appearance of safety and so leads the tenant or others with his consent to use the land in a way which but for the repairs they would recognize to be dangerous.

\*     \*     \*     \*     \*     \*     \*     \*

c. The lessor is subject to liability if, but only if, the lessee neither knows nor should know that the purported repairs have not been made or have been negligently made and so, relying upon the deceptive appearance of safety, subjects himself to the dangers or invites or permits his licensees to encounter them.   \*   \*   \*"

and by section 325 of the *Restatement of the Law of Torts, Negligence,* which states:

"One who gratuitously undertakes with another to do an act or to render services which he should recognize as necessary to the other's bodily safety and thereby leads the other in reasonable reliance upon the performance of such undertaking

(a) to refrain from himself taking the necessary steps to secure his safety or from securing the then available protective action by third persons, or

(b) to enter upon a course of conduct which is dangerous unless the undertaking is carried out,

is subject to liability to the other for bodily harm resulting from the actor's failure to exercise reasonable care to carry out his undertaking."

It would appear therefore that in the view of the *Restatement* the reliance factor is a *sine qua non.* It would also appear that the *Restatement* has limited the application of its rule to "bodily" injury while the common-law rule is not so limited, *La Brasca v. Hinchman, supra,* 81 *N. J. L.* 367 (*Sup. Ct.* 1911). But the best that can be said is that the majority of the cases predicate liability either upon the fact that the voluntary repairs by the landlord increased the pre-existing danger or that the repairs led the tenant to rely upon them as correcting the pre-existing defect, *Prosser on Torts* (*2d ed.* 1955), *supra,* 186, 187, 476; 150 *A. L. R.* 1378–1382, *supra.*

■ The New Jersey cases, before the opinion below, have not expressly recognized or expounded upon these distinguishing features, but there is inherent in our cases a recognition of the existence of the requirement that there must at least be reliance upon the repairs as made as having remedied

the defect. We find it in *Caruso v. Monschein,* 24 *N. J. Super.* 55, 58 (*App. Div.* 1952) where the court said:

"Here the landlord was informed of the defective condition which caused the leakage of water; he voluntarily undertook to repair it, and the repairs he made were ineffective. The landlord informed the tenant that the defective condition had been fixed, and the tenant relied thereon. Under these circumstances, an inference of negligence in the performance of the assumed duty to make repairs was justifiable."

We find it in *Vollkommer v. Menge,* 118 *N. J. L.* 360, 362 (*Sup. Ct.* 1937), where the court said:

"* * * While a landlord is under no duty to make repairs in the absence of an express covenant imposing that obligation, yet, if he gratuitously undertakes, during the term, to repair the demised premises, he is under a duty to exercise ordinary care and diligence in so doing. And this duty is not confined to the work actually done, as distinguished from the work required and undertaken to be done; the tenant is entitled to rely on the sufficiency of such repairs as the landlord has undertaken. The liability of a landlord for ineffective repairs, where he is not bound to make any repairs, is the correlative of the tenant's right to rely on the sufficiency of such repairs as the landlord has voluntarily undertaken. The duty is so measured."

See also *Edwards v. Stein,* 121 *N. J. L.* 233, 235 (*Sup. Ct.* 1938), *La Brasca v. Hinchman, supra,* 81 *N. J. L.* 367 (*Sup. Ct.* 1911), and *Grugan v. Shore Hotels Finance & Exchange Corp., supra,* 126 *N. J. L.* 257 (*E. & A.* 1940), where the court affirmed a denial of relief on this theory primarily because of the absence of any reliance factor, *Id.,* 126 *N. J. L.,* at *page* 261.

The classic situations, none of which are found in this State, are those where the tenant had no knowledge of the voluntary making of repairs by the landlord and could therefore place no reliance upon them. In such cases as *Hill v. Day,* 108 *Me.* 467, 81 *A.* 581 (*Sup. Jud. Ct.* 1911), *Kuchynski v. Ukryn,* 89 *N. H.* 400, 200 *A.* 416 (*Sup. Ct.* 1938), recovery was denied for injuries caused by improper repairs. In *Kirshenbaum v. General Outdoor Adv. Co.,* 258 *N. Y.* 489, 180 *N. E.* 245, 84 *A. L. R.* 645, rehearing denied 259 *N. Y.* 525, 182 *N. E.* 165 (*Ct. App.* 1932);

*Hines v. Cirelo,* 260 *App. Div.* 878, 22 *N. Y. S.* 2d 878 (*App. Div.* 1940), affirmed without opinion 285 *N. Y.* 786, 35 *N. E.* 2d 188 (*Ct. App.* 1941); *Rhoades v. Seidel,* 139 *Mich.* 608, 102 *N. W.* 1025 (*Sup. Ct.* 1905), recovery was denied on this theory where the tenants knew that the repairs had not been made properly.

■ We think the controlling principle in all these cases should be, not whether the premises are made more dangerous by the repair voluntarily made by the landlord or whether the tenant was misled into relying upon the sufficiency of the repair to his detriment, but rather that these factors should be considered only in determining the reasonableness of the conduct of the landlord in the circumstances of the particular case. In *Taylor v. New Jersey Highway Authority,* 22 *N. J.* 454, 462 (1956), we said:

"In modern times the immunities have rightly, though gradually, been giving way to the overriding social view that where there is foreseeability of substantial harm landowners, as well as other members of society, should generally be subjected to a reasonable duty of care to avoid it. Many recent New Jersey decisions furnish vivid evidence of this trend and the marvelous adaptability of the common law in reshaping old doctrines to meet the needs of our own period in history."

Thus, though a landlord is not liable for nonfeasance where there is no duty to repair, if he voluntarily undertakes a repair he may be held liable for not doing enough only where his conduct in such circumstances amounts to negligence; *cf. Kirshenbaum v. General Outdoor Adv. Co., supra,* 258 *N. Y.* 489, 180 *N. E.* 245, 84 *A. L. R.* 645, rehearing denied 259 *N. Y.* 525, 182 *N. E.* 165 (*Ct. App.* 1932).

■■ So viewed the facts of this case indicate an absence of that quality of conduct sufficient to subject the landlord to liability. There was no assurance by the defendant that the condition causing the water had been corrected. As a matter of fact, if there was, it was soon dispelled prior to the first hurricane and, furthermore, there is absolutely no indication that the plaintiffs were lulled into any false belief that they would not again be bothered

by water. In these circumstances it was proper to take the case from the jury, *Ferdinand v. Agricultural Ins. Co. of Watertown, N. Y.,* 22 *N. J.* 482 (1956).

There is no need to consider the other points raised since in no event could our rulings thereon change the disposition already made.

The judgment is, accordingly, affirmed.

HEHER, J. (dissenting). Plaintiffs adduced expert opinion evidence tending to show that "if waterproofing were properly applied and the right type applied, it would have stopped the water from coming through that [basement] wall." The witness was a "consulting engineer" and the operator of "a contracting outfit which waterproofs basements, mostly for builders." He said he would have "put plaster around the entire walls, all the way around, and all the way to the top, a sump pump and drain system with drains around the entire floor," and "* * * probably have two pumps to pump out the amount of water that occurred there"; "that would keep water from coming through the walls and up through the floor, but that still wouldn't keep water from coming through this [outside] areaway and going down"; "* * * they also have to keep the water out of that areaway"; "they can build a wall around it, or they can slope the land away, being sure that they won't have this big lake of water behind there, because there is a big depression back there, a wide depression behind this building"; "three things" were necessary,—"to keep the water from coming through the walls, and also through the floor, and also keep it from going through the areaway, to be perfectly safe and prevent this thing from happening"; "(o)n the walls," the witness said he "would suggest a plaster coat, the floors, the sump pump and drain system, and a positive method of keeping the water out of these areaways would be necessary for them to feel sure about this basement"; a "proper type of waterproofing compound * * * would be sufficient to prevent the water from coming through that wall where the plaster is applied,

no matter what the difference in elevation between the water on one side and the other; there isn't enough space to make it too big."

A witness versed in the "requirements necessary to properly grade a piece of land" testified that on December 28, 1954, when he inspected the locus, the building had "two leaders * * * coming down, straight down, and * * * water all entered into what" he "would call a saucer," and "(i)nstead of flowing away from the building, it flowed in towards it"; and on a later inspection he found a "slight change" in the adjoining macadamized parking area, a difference in elevation, and a "new [curb] and an old one," "which means that when water backs up on this curb, as much as two and half inches of water would flow into any openings that are around."

We are not referred to record evidence *contra*.

The fault existed from the beginning of the tenancy.

New Jersey has given consistent adherence to the common-law doctrine applied in *Coggs v. Bernard* (1703), 2 *Ld. Raym.* 909, 92 *Eng. Rep.* 107, that one who undertakes to perform an act and performs it negligently, whereby damage results, is liable for his misfeasance; "if a man acts by commission for another gratis," said Lord Holt, "and in the executing his commission behaves himself negligently, he is answerable. * * * This undertaking obliges the undertaker to a diligent management." See *La Brasca v. Hinchman,* 81 *N. J. L.* 367 (*Sup. Ct.* 1911). By the common law, said Chancellor Kent, "a mandatary or one who undertakes to do an act for another without reward, is not answerable for omitting to do the act, and is only responsible when he attempts to do it, and does it amiss. In other words, he is responsible for a mis-feasance, but not for a non-feasance." *Thorne v. Deas,* 4 *Johns* (*N. Y.*) 84. The basis of liability is the breach of a voluntarily assumed duty "to use proper care in the performance of the task"; and, while a mere gratuitous promise to render assistance is not enough, "(t)he duty is * * * all the more clear when" the promisor "has actually entered upon

the performance itself. A landlord who makes repairs on leased premises although he is under no obligation to do so assumes a duty to his tenant and to those entering in the right of the tenant, to see that the repairs are safe, or at least that the tenant does not remain in ignorance of any danger"; the cases stress the element of reliance upon the ostensible performance of the undertaking, the misleading of the tenant "into the belief that [the danger] has been removed, or by inducing him to forego the possibility of help from other sources"; and there are cases rejecting this requirement, holding the landlord "to the obligation of reasonable care in his undertaking, although the plaintiff has not been further endangered, misled, or deprived of other help." *Prosser, Law of Torts,* (2d ed.), 186, 187, 476. The duty is to exercise "reasonable care," considered by the author as providing "all the limitation that is really necessary." *Ibid.* 187. See *Seavey, "Reliance Upon Gratuitous Promises or Other Conduct,"* 64 *Harv. L. Rev.* 913, 918 *et seq.* (1951). Compare *O'Leary v. Erie R. Co.,* 169 *N. Y.* 289, 62 *N. E.* 346 (*Ct. App.* 1901).

And so it is a corollary principle that the duty of reasonable care in the performance of a gratuitous undertaking to make repairs is not confined to the work actually done, as distinct from the work required and undertaken to be done; the landlord's liability in the circumstances is the correlative of the tenant's right to rely on the sufficiency of the repairs the landlord has voluntarily undertaken. Such is the measure of the duty. *Vollkommer v. Menge,* 118 *N. J. L.* 360 (*Sup. Ct.* 1937).

My brethren deem the controlling principle to be, "not whether the premises are made more dangerous by the repair voluntarily made by the landlord or whether the tenant was misled into relying upon the sufficiency of the repair to his detriment," but rather to consider these as elements bearing solely upon "the reasonableness of the conduct of the landlord in the circumstances of the particular case"; and he may be held liable for "not doing enough only where his conduct in such circumstances amounts to negligence."

Yet where, it was held in the cited case of *Kirshenbaum v. General Outdoor Advertising Co.,* 258 *N. Y.* 489, 180 *N. E.* 245, 84 *A. L. R.* 645 (*Ct. App.* 1932), there is present "an element of misrepresentation by the landlord and a reliance thereupon by the tenant," there is liability in tort, although not in contract; and so also where the gratuitous undertaking was not fully performed, and there is loss from nonrepair, if the landlord has, "by abandoning the work as finished, given a false assurance that the premises are in complete repair, and the tenant has placed full reliance thereupon;" the "'gist of the defendant's wrong is the misleading quality of his conduct and words.' *Bohlen, Studies in the Law of Torts, p.* 212. 'It is the duty of one choosing to perform a gratuitous undertaking to take care lest he should mislead his promisee into the belief that the work has been well done and the premises made safe for us.' *Id. p.* 224."

The issues of performance of the asserted gratuitous undertaking to repair, measured by the given standard of duty, and reliance upon deceptive assurances of performance, express or reasonably implied, are, I submit, peculiarly within the province of the jury. *Vollkommer v. Menge, supra.* There is evidence tending to show that the landlord failed in its assumed duty, indeed aggravated the fault by surface changes of the outside areaway; and reasonable reliance upon the false appearance of performance would be a permissible deduction. Were it not for the assurance thus given, the tenants could have taken other means to protect their property. See in this regard Professor Seavey's conclusions in the article cited *supra.*

And the duty of care attending the performance of a gratuitous undertaking to repair is nondelegable. *Prosser, supra,* 476.

I would reverse the judgment.

WEINTRAUB, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and WEINTRAUB—5.

*For reversal*—Justice HEHER—1.