72 N.J. Super. 486 (1962)
179 A.2d 38
CLARA ANN CLARK AND NORMAN CLARK, PLAINTIFFS-APPELLANTS,
v.
HEINS WICHMAN, M.D., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 15, 1962.
Decided March 5, 1962.
*487 Before Judges PRICE, SULLIVAN and LEWIS.
*488 Mr. William J. McGovern argued the cause for appellant (Messrs. Mackerley & Friedman, attorneys; Mr. McGovern, of counsel).
Mr. Ralph Porzio argued the cause for the respondent (Mr. Myron J. Bromberg, on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
This is a malpractice case, tried without a jury. Plaintiffs Clara Ann Clark and Norman Clark (husband and wife) appeal from a judgment for defendant entered at the close of the trial by the Superior Court, Law Division, Morris County.
Mrs. Clark was injured in an automobile accident on Saturday, August 10, 1957 and was taken by ambulance to the St. Clare's Hospital in Denville, New Jersey, suffering from injuries including a comminuted fracture of the left femoral shaft. She was placed in temporary traction and, on the following Tuesday, defendant Dr. Heins Wichman (an orthopedic surgeon), member of the hospital staff and the attending physician, performed an operation described as an open reduction with insertion of a Kuntscher intermedullary nail and the application of two Parham bands. The postoperative X-rays indicated an anatomical alignment.
While then at the hospital, Mrs. Clark was not permitted out of bed. She developed traumatic psychosis, suffered hallucinations "in the religious field," and became "irrational and very violent." On August 27 she was committed, upon the certification of two other doctors and by an order of court, to the Greystone Park State Hospital. The permit for treatment there was signed by her husband. Confinement at this institution continued until September 17, during which period she was not under the care of Dr. Wichman. Upon her release, she returned to St. Clare's Hospital and resumed treatment under Dr. Wichman, who obtained current X-rays of the injured extremity. In comparison with the previous films, these disclosed that there was some lateral angulation *489 at the fracture site. The doctor was "perturbed" at this discovery and testified that upon interrogating the patient, he was advised that "the other hospital" made her get up and walk, and the doctor (at Greystone) told her to "stomp" on the leg. Dr. Wichman then specifically told her not to bear any weight on the fractured leg and, according to her testimony, "I was given first a walker and then instructed in the use of crutches by the orderly." She was walking on crutches on September 27 when discharged from the St. Clare's Hospital. At regular intervals thereafter she visited the doctor at his office for X-ray examinations and treatment.
The following November Mrs. Clark was rehospitalized for ten days. The X-rays revealed a degree of shortening of the leg. Dr. Wichman expressed the opinion that the premature weight-bearing, before fibrous fixation of the fragments, resulted in a certain degree of telescoping or impaction which may have caused the "shortening." It was deemed necessary to reoperate for the purpose of abbreviating the "femoral nail" and to remove the Parham bands as the upper one had apparently become loose and was no longer discharging its function.
On January 9, 1958 X-rays were again taken and the patient was advised that she could begin partial weight-bearing  a little weight "with the aid of crutches." She returned to Dr. Wichman in March; more X-rays were obtained and she was requested to exert "an additional amount of weight." Her next visit was May 1, when she was told to bear full weight on her leg.
At this point in the chronology of events, serious negotiations were undertaken by plaintiffs toward an amicable settlement of their then pending automobile negligence case; the trial date was June 11, 1958. The injured plaintiff was examined by Dr. Bertram Kummel, on behalf of an insurance company, who reviewed her case history and X-rays and made an independent physical examination. A copy of his findings was submitted to the attorneys handling that litigation; it concluded: "Mrs. Clark has what is *490 technically considered a delayed union of the femur. This will probably become a non-union and require surgery, including bone grafts." When confronted with said report on June 2, Dr. Wichman stated to plaintiffs:
"Well, I agree with what the other doctor says as far as the x-ray findings are concerned, but I have all hopes that this would go on to satisfactory union but what I thought that the opinion it would definitely go to non-union was premature, because you can't tell until you have waited and seen."
Mrs. Clark was also examined by Dr. Carl A. Maxwell, an orthopedic surgeon, on June 10, the day before her accident case was scheduled for trial. Although he detected some false motion in the lower third of the femur, such motion was not identified to exist at the fracture site. Dr. Wichman testified that he urged against effecting a settlement of the accident litigation at that time "because there may be future surgery necessary," and that "the prognosis was precarious" as the fracture had not yet healed. The case was settled in plaintiffs' favor for the sum of $28,500, which took into consideration the possibility that Mrs. Clark might have to undergo additional surgery.
In July the roentgenograms showed a continuation of callus formation; the patient was advised to "take it easy," and that "there probably would be no need for an operation." Approximately two months afterward (September 15) further X-rays disclosed that there was not as much healing as "previously had been indicated on one of the lateral films," and she was advised to stop bearing weight on the fractured limb. The possibility of further surgical procedure and bone grafting was discussed during that visitation. January 12, 1959 was her last visit to Dr. Wichman. The X-ray taken at that time revealed "abundant callus, which is bone formation which contributes to the healing of the fracture, and it shows actual trabeculations and bone growing." The film, said the doctor, "showed no definite evidence of a non-union, but it still did not show the fracture *491 completely healed." Mrs. Clark quoted the doctor as saying on that occasion, "Now, you can commence just again a small amount of weight." She was instructed to return to him in March, but she did not do so.
On April 18, 1959 the injured plaintiff consulted Dr. Harold T. Hansen, who specialized in orthopedic surgery. His X-rays indicated an abundance of callus about the fracture site, but disclosed an apparent fractural line. He rendered a diagnosis of nonunion of the fracture and recommended bone-graft surgery, which was successfully performed on May 6, 1959 at the New Jersey Orthopedic Hospital. Within five months Mrs. Clark was able to walk. The malpractice suit against Dr. Wichman followed shortly thereafter.
The substance of plaintiffs' contention on appeal is that (1) defendant breached the duty he owed to the female plaintiff in failing to give instructions or render treatment during her confinement at Greystone; (2) the trier of the facts, without medical experts, could conclude from common experience that defendant was negligent in ordering his patient to bear full weight on her fractured leg; and (3) the judgment of the trial court was unsupported by, and inconsistent with the competent, relevant and reasonably credible evidence.

I.
The argument that defendant abandoned his patient when she was committed to Greystone is without merit. The release of a patient from one hospital to another, particularly when pursuant to an order of court, does not, in itself, establish or imply an abandonment. This is not a case of unwarranted forsaking of a patient without notice or without providing a competent substitute physician. Note, 70 C.J.S. Physicians and Surgeons, § 48(f)(2), p. 966; 41 Am. Jur., Physicians and Surgeons, sec. 102, p. 217. Where a physician under appropriate circumstances ceases to attend a patient, his responsibility ordinarily ceases *492 without any formality. Cf. Schmit v. Esser, 183 Minn. 354, 236 N.W. 622, 74 A.L.R. 1312, 1316 (Sup. Ct. 1931). An abandonment consists of "a failure by the physician to continue to provide service to the patient when it is still needed in a case for which the physician has assumed responsibility and from which he has not been properly relieved." (Emphasis supplied.) Louisell and Williams, Trial of Medical Malpractice Cases, sec. 8.08, p. 218 (1960). See also Annotation, "Physician-Abandonment of Case," 57 A.L.R.2d 432; and the case of Burnett v. Layman, 133 Tenn. 323, 191 S.W. 157, 158 (Sup. Ct. 1915), supporting the proposition that medical abandonment depends upon the circumstances of each individual case.
Mrs. Clark was in a psychotic condition when, with the consent of her husband, she was duly committed to the Greystone Park Hospital. The state institution was professionally staffed and had the benefit of a photostatic copy of the "report" from the St. Clare's Hospital. The patient was admitted on a stretcher and was placed under the medical care of the attending doctors and nurses at Greystone. On two occasions they took X-rays of her skull and the fractured femur. There is nothing in the record to indicate that Dr. Wichman had a legal duty, or even the privilege or right to assume any responsibility with respect to Mrs. Clark's treatment while she was confined at the state hospital; or that Dr. Wichman had not been willing and available to render medical assistance if it had been requested. In fact, when released from Greystone, she was returned to the St. Clare's Hospital where Dr. Wichman resumed charge of her case.
Additionally, we observe that neither the pleadings nor the pretrial order raised the specific issue of doctor-patient abandonment. That it was not a material element of plaintiffs' case at the trial level is evident from the argument of plaintiffs' counsel in summation:
"* * * remember, your Honor, the malpractice in this case was not what he did initially, not what occurred at Greystone, but *493 the excruciating pain that he put this woman through from the time he told her to walk on a leg where he knew there was non-union, despite the fact he didn't tell her that."
Ordinarily this court will decline to consider questions not properly presented to the trial judge unless they relate to jurisdiction or issues of great public interest. Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959), certif. denied 31 N.J. 554 (1960). We have reviewed the subject, however, because of the significant nature of plaintiffs' claim under the particular circumstances of this case. We find no evidence of professional abandonment.

II.
Our decisional law is established with clarity that "one who holds himself out as a specialist must employ not merely the skill of a general practitioner, but also that special degree of skill normally possessed by the average physician who devotes special study and attention to the particular organ or disease or injury involved, having regard to the present state of scientific knowledge." See Coleman v. Wilson, 85 N.J.L. 203, 207 (E. & A. 1913), and the statement of the rule in the majority opinion of this court in Carbone v. Warburton, 22 N.J. Super. 5, 9 (App. Div. 1952), affirmed 11 N.J. 418, 426 (1953). Defendant is a specialist in the field of orthopedics and concedes that his professional obligations were within the perimeter of these decisions. The trial court, however, in its oral opinion, did not mention the rule expressed in the Coleman and Carbone cases, but quoted the cardinal principle of law applicable to the general practitioner as enunciated in Hull v. Plume, 131 N.J.L. 511, 514 (E. & A. 1944), viz.:
"* * * a physician undertakes in the practice of his profession that he is possessed of that degree of knowledge and skill therein which usually pertains to other members of his profession, and that mere proof of error or mistake is not sufficient to establish negligence." *494 Thus, argue plaintiffs, the trial court committed reversible error. We do not agree. All of the medical testimony adduced at the hearing was by orthopedic doctors (five in number) and the trial was conducted on the theory of alleged malpractice of an orthopedic surgeon. Moreover, as pointed out in Bauer v. 141-149 Cedar Lane Holding Co., 42 N.J. Super. 110, 121 (App. Div. 1956), affirmed 24 N.J. 139 (1957), appeals are taken from judgments and not from opinions. See Hughes v. Eisner, 8 N.J. 228, 229 (1951), therein cited.
The basic issue is whether the defendant was negligent in advising his patient, as and when he did, to put weight upon her impaired leg. Dr. Wichman explained that the lower third of the femur is a very large bone and is notorious for poor healing, that normally a fractured bone is expected to heal within six to eight months, and if it takes longer than that it is generally referred to as a delayed union. He stated:
"A fracture can heal in two years and it could heal, say, in five months, and as long as you see progress  at least reasonable progress  you feel that this will probably go on to union, and we consider it a delayed union. If after continued observation it seems to us that further progress in the healing is not made, then we come to the conclusion that probably non-union exists. The difference between delayed union and non-union is, I believe, one of degree. * * * We knew we were dealing with a delayed union, and it was just a matter of waiting to see eventually whether or not it would not unite."
The doctor further testified that weight-bearing applied at the right time "promotes union and callus formation," and when dealing with a delayed union "end to end compression causes stimulation of bony union." It was not denied that he advised Mrs. Clark at various times, as heretofore indicated, to bear weight upon her injured limb. He maintained there was no motion at the fracture site at any time during the healing process while he was treating her for a "delayed union"; bone grafting is indicated as a procedure after *495 definite diagnosis of nonunion has been established; at the time of Mrs. Clark's last visit (January 12, 1959) there was no definite evidence of a nonunion; and that there was nothing he did or failed to do that was in any way unusual or abnormal or a departure from the accepted surgical and medical practices in the area.
The science of medicine is not an exact science. Since time immemorial society has been concerned with the just disposition of claims against members of the medical profession. Civil malpractice has been defined as "negligent or unskillful performance of the duties incumbent upon the physician arising from his relationship with his patients or the want of proper care and skill in the performance of a professional act." Rogers, Expert Testimony (3d ed. 1941), sec. 151, p. 358. See also Regan, Doctor and Patient and the Law (3d ed. 1956), p. 17. "Success of ill-founded, albeit honestly made, claims can have harmful effects in thwarting reasonable innovations in medical practice and genuine progress of the healing arts." Louisell and Williams, op. cit., supra, sec. 1.02, p. 4. A doctor is not an insurer of his patient's recovery. He is not a guarantor. Young v. Stevens, 132 N.J.L. 124, 129 (E. & A. 1944). "A physician is not a warrantor of cures." See opinion of Judge (later Chief Justice) Taft in Ewing v. Goode, 78 F. 442 (6 Cir. 1897). He is not liable for honest mistakes of judgment. Evidence of mere mistake or error is insufficient to sustain an action for negligence. Cf. Burdge v. Errickson, 132 N.J.L. 377 (E. & A. 1945). The impedient absurdity of the Babylonian Code of Hammurabi (2250 B.C.) which imposed an insurer's liability upon the physician of that day  "If a physician make a deep incision upon a man with his bronze lancet and cause the man's death, or operate on the eye socket of a man with his bronze lancet and destroy the man's eye, they shall cut off his hand"  has long since given way to the encouragement of medical advancement and the protection of the professional practitioner consistent with safeguarding, according to high *496 ethical standards, the individual rights of the patient. Our guiding precedent has been stated in Terhune v. Margaret Hague Maternity Hosp., 63 N.J. Super. 106, 111 (App. Div. 1960):
"In an action for negligence or malpractice against a physician the plaintiff ordinarily is required to establish that the defendant's treatment or care fell below the standard established and recognized by the medical profession for the indicated condition of the patient, and the standard must be proven by expert medical testimony. Toy v. Rickert, supra (53 N.J. Super. 27, 32). But where the asserted negligence consists of conduct so obviously wanting in reasonable medical skill and prudence that it may be so adjudged even by a layman, expert testimony as to the standard offended is unnecessary." Citing Becker v. Eisenstodt, 60 N.J. Super. 240 (App. Div. 1960).
Appellants rely upon the doctrinal concepts expressed in Becker v. Eisenstodt, supra, which case is clearly distinguishable from the facts sub judice. There, the plaintiff did not charge the defendant with lack of professional skill or judgment, but rather founded his allegation of negligence upon a plastic surgeon's careless use of a caustic in the postoperative treatment of his patient's nose, the "type of negligence which lay jurors could appreciate without the necessity of medical experts to describe the applicable standard of care." A classic illustration of these exceptional situations is the case where a surgeon leaves a sponge in the patient's body after an operation. See Prosser on Torts (2d ed. 1955), sec. 42, pp. 199, 210; Rogers, op. cit., supra, sec. 165, p. 370; and the decisions therein collected. In the case at bar the asserted negligence of the defendant does not consist of conduct so obviously lacking in medical skill and prudence as to make it unnecessary to call upon expert testimony to establish applicable standards and culpable negligence. In the complaint filed against him, defendant is accused of failing to exercise that degree of skill, care, and diligence as is reasonable and ordinary for those engaged in medical practice on his professional level.
*497 Dr. Wichman's legal duty, as stated in Carbone v. Warburton, supra (11 N.J., at p. 428), "must be measured by some medical standard of care and treatment, and what that standard is and whether defendant negligently departed from it to the plaintiff's injury can competently be testified to only by one qualified to know of it." The overwhelming weight of authority adopts the view that, generally, expert evidence is essential to support an action for malpractice against a physician or surgeon. Annotations, "Malpractice  Necessity of Expert Evidence," 141 A.L.R. 5, and "Malpractice  Expert Witness  Necessity," 81 A.L.R.2d 597. The same principle has been applied to fracture cases. Annotation, "Malpractice  Fractures  Dislocations," 54 A.L.R.2d 200, 205. See also 7 Wigmore, Evidence (3d ed. 1940), sec. 2090(a), p. 453; 3 Belli, Modern Trials, sec. 330, p. 1980 (1954). Accord, Sanzari v. Rosenfeld, 34 N.J. 128, 135 (1961), wherein our Supreme Court held that failure to advance proof of an accepted standard of care would warrant a dismissal at the close of plaintiff's case.

III.
The expert testimony proffered by plaintiffs at the trial related to medical facts and not to medical negligence. Dr. Kummel admitted under cross-examination that he could not be positive concerning his prognostication (in March 1958) of probable nonunion. He said "I couldn't be at that stage." Dr. Maxwell (in June 1958) was of the opinion "that given adequate time and protection from severe trauma, this fracture should be expected to unite. A period of at least four months further should be allowed before final evaluation." Dr. Hansen's diagnosis of nonunion was approximately four months after Mrs. Clark had last seen Dr. Wichman. Dr. Hansen testified that "there are a lot of things about bone healing that we just don't know," and from an X-ray standpoint he did not know what happened between January 12, 1959 and the time of *498 his X-ray in April. These orthopedists did not say or indicate that the defendant had in any way failed to exercise that degree of knowledge and skill in his diagnosis and treatment, which usually pertains to members of his profession in the area specializing in orthopedics. Their testimony did not establish an accepted standard of care, although the consensus of all medical testimony was that the difference between a delayed union and a nonunion was one of degree.
Dr. Saul I. Firtel, also a specialist in orthopedic surgery, was called as a witness on behalf of the defendant. After giving his version as to a delayed union and a nonunion and their interrelationship, he testified:
"Now, a delayed union can go on for a year or two or until such time as we have definitely established to the best of our knowledge that there is present a non-union or failure of union."
He was requested to examine the X-ray of January 12, 1959 taken by Dr. Wichman (when he last examined the patient) and that obtained by Dr. Hansen on May 5, 1959. After making a comparison, he declared that the one produced by Dr. Hansen evinced a definite nonunion at the fracture site, whereas in the previous X-ray taken by Dr. Wichman the "criteria that should be present to call a fracture a non-union were not present." He further testified: "There have been definite changes that are evident between these two X-rays."
The trial judge throughout his oral opinion recognized the difficulty with which he was confronted in attempting to resolve the medical issues without the benefit of expert testimony on the crucial questions of negligence and causation. The only evidence in this connection was furnished by the defendant's witness Dr. Firtel who, in answer to a hypothetical question incorporating a recital of the facts, stated that there had not been any departure from "standard surgical practices" and, under redirect examination, testified:
*499 "Q. * * * Assuming that Dr. Wichman found no motion at the fracture site, would he be justified in telling this woman to apply weight or apply some weight?
A. Yes, he would."
There is no proof in the record that the defendant was professionally negligent in his diagnosis of delayed union, optimistic prognosis, "wait and see" judgment, conservative weight-bearing therapy, or in his hesitancy to advise bone-grafting surgery in the light of the X-ray disclosures.
The conclusion reached by the trial court was that the evidence did not support plaintiffs' claim of actionable negligence by the defendant either in the diagnosis or the treatment of his patient, Mrs. Clark. Our independent review of the record leads to the same result.
Affirmed.