NEW JERSEY CARPENTERS HEALTH
FUND, et al., Plaintiffs,

v.

PHILIP MORRIS, INC.,
et al., Defendants.

No. CIV. A. 97–4728 (MTB).

United States District Court,
D. New Jersey.

Aug. 26, 1998.

Milberg, Weiss, Bershad, Hynes & Lerach by Michael C. Spencer, New York, NY, Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano by David Jacoby, G. Robert Blakey, Einer Elhauge, Cherry Hill, NJ, Connerton & Ray by James S. Ray, Washington, D.C., for Plaintiffs.

McCarter & English by James F. Hammill, Cherry Hill, Arnold, Day & Porter by David S. Eggert, Washington, D.C., for Defendants.

Greenbaum, Rowe, Smith, Ravin, Davis & Himmel by Alan S. Naar, Woodbridge, NJ, for Defendant Liggett–Myers.

## *OPINION*

BARRY, District Judge.

Plaintiffs, six multi-employer health and welfare trust funds operating in New Jersey (the "Funds") [1] and providing comprehensive health care benefits to union workers, to their families, and to covered retirees (collectively "participants"), have filed this action against the leading tobacco companies [2] and their lobbying and public relations agents [3] (collectively as "defendants").

In their behemoth 124–page, 350–paragraph complaint, the Funds set forth virtually the entire history of the marketing of cigarettes and allege that for decades the defendants have collectively engaged in sys-

---

1. The named plaintiffs are New Jersey Carpenters Health Fund, United Food & Commercial Workers Union Local 56 Department of Health & Welfare, United Food and Commercial Union and Participating Food Industry Employers Tri-State Health & Welfare Fund, Laborers International Union of North America Local 415 Health and Welfare Fund, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry Local 322 Health & Welfare Fund, and Cement Masons Local 699 Health & Welfare Fund. The complaint is a class action complaint filed on behalf of all funds in New Jersey that are similarly situated.

2. The tobacco companies are Philip Morris, Inc., R.J. Reynolds, Tobacco Company, Brown & Williamson Tobacco Corporation, B.A.T. Industries P.L.C., Lorillard Tobacco Company, Inc., Liggett & Myers Inc., The American Tobacco Company, and United States Tobacco Company.

3. The remaining defendants are The Council for Tobacco Research—U.S.A., Inc., The Tobacco Institute, Inc., Smokeless Tobacco Council, Inc., and Hill & Knowlton, Inc.

tematic and calculated misconduct, including, among other things: fraudulently failing to disclose accurate information as to the health risks of smoking, intentionally misrepresenting the addictiveness of nicotine, secretly manipulating and controlling nicotine levels to assure addiction, and purposefully inhibiting the development and marketing of safer, less-addictive cigarettes. Compl. ¶ 4. Defendants' falsehoods and misrepresentations, it is alleged, resulted in an increase in tobacco-related injuries suffered by participants and heightened health care costs for which the Funds were responsible.

The Funds are pursuing claims of fraud (Count VI), federal RICO (Counts I and II), federal and state antitrust (Count III and IV), as well as claims of undertaking and failing to perform a special duty (Count VII), and unjust enrichment (Count XI).[4] They seek to recover damages presumably in the multi-millions of dollars, including but not limited to the health care costs they paid allegedly because of defendants' activities— the big ticket item, to be sure. They also seek, among other things, injunctive relief requiring the defendants to disclose research and information, fund corrective public education, fund cessation programs for dependent smokers, disclose nicotine yields in their cigarettes, and cease advertising and promoting smoking to minors. Prayer for Relief, Compl. at 121–122. Aside from common law and statutory claims specific to a particular state, the virtually identical complaint has been filed by the relevant Funds in about forty states. The success of these actions thus far has been less than ringing.[5]

Defendants now move to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim and, in the alternative, pursuant to Fed.R.Civ.P. 12(b)(7), for failure to join necessary parties.[6]

---

4. The Funds have voluntarily dismissed their claims under the New Jersey Consumer Fraud Act (Count V), strict liability (Count VIII), negligence (Count IX), and breach of express and implied warranties (Count X).

5. As far as this court is aware, seven courts have ruled on motions to dismiss. In four cases, the courts dismissed the complaints *in toto*. *See Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, No. 97–1051 (D.Or. Aug. 3, 1998) (hereinafter *"Oregon Laborers–Employers"*) (dismissing complaint containing federal and state RICO, federal and state antitrust, Oregon Unfair Trade Practices Act, fraud, unjust enrichment, negligent breach of a special assumed duty, civil conspiracy and indemnity claims); *Seafarers Welfare Plan v. Philip Morris*, No. 97–2127 (D.Md. July 13, 1998) (hereinafter *"Seafarers"*) (dismissing complaint containing RICO, antitrust, Maryland Consumer Protection Act, fraud, negligent misrepresentation, conspiracy, breach of voluntarily undertaken duty, and unjust enrichment claims); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, No. 97–5344, 1998 WL 212846 (E.D.Pa. April 22, 1998) (hereinafter *"Steamfitters"*) (dismissing complaint containing RICO, antitrust, fraud, breach of a special duty, and unjust enrichment claims); *Southeast Florida Laborers District Health and Welfare Trust Fund v. Philip Morris*, No. CIV.97–8715, 1998 WL 186878 (S.D.Fla. April 13, 1998) (hereinafter *"Southeast Florida Laborers"*) (dismissing complaint containing federal RICO, state antitrust, fraud, breach of a special duty, and unjust enrichment claims). In another case, the court dismissed all claims except for the plaintiffs' claim for negligent breach of a special duty. *See*

*Most Claims Dismissed from California Union's Health Fund Lawsuit*, 12 No. 1 Mealey's Litig. Rep.: Tobacco 6, May 7, 1998 (discussing but not providing text of opinion for *Stationary Engineers Local 39 Health and Welfare Trust Fund v. Philip Morris*, No. C–97–01515 (N.D. Cal. April 30, 1998), thereby dismissing RICO, federal and state antitrust, restitution, unfair business practices, fraud and misrepresentation, intentional breach of a special duty, and unjust enrichment claims but refusing to dismiss the negligent breach of a special duty claim and allowing plaintiffs to amend fraud claims). Only two courts have allowed more than one claim to survive a motion to dismiss. *See West Virginia Laborers' Pension Trust Fund v. Philip Morris, Inc.*, No. 97–0708 (S.D.W.Va. Aug. 12, 1998) (hereinafter *"West Virginia Laborers' Fund"*) (summarily denying defendants' motion to dismiss); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 7 F.Supp.2d 277 (S.D.N.Y. 1998) (hereinafter *"Laborers Local 17"*) (dismissing only federal and state antitrust and unjust enrichment claims but refusing to dismiss RICO, fraud and breach of special duty claims).

6. Defendant Liggett & Myers Inc. ("Liggett") filed a separate motion to dismiss the Funds' complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(7) but relies upon the briefs supplied by the other defendants in this action. Because of the identity of issues, this opinion and accompanying order apply with equal force to the motion separately filed by Liggett.

In addition, B.A.T. Indus., P.L.C. does not join in the motion as it has apparently not been served. Def. Br. at n. 1.

## I. Defendants' 12(b)(6) Motion

The recent explosion of litigation and proposed legislation centering around the tobacco industry has brought many issues to the forefront of public debate. The most fundamental issue, at least in this court's view, is whether smokers should be responsible for their own behavior or whether that behavior should be excused—or at least explained—by supposedly wicked forces beyond the control of these malleable and helpless victims, such as advertising. Somewhat related thereto is the issue of whether, as long as tobacco is legal, the tobacco industry should be liable for successfully marketing its legal products. Other issues surface more regularly in the burgeoning litigation. When did the tobacco industry became aware of the health risks of tobacco and the addictiveness of nicotine? Did the tobacco industry knowingly conspire to mislead the public into wrongfully believing that a link between cancer and tobacco use was still an "open question"? Are the risks associated with tobacco products so well-known as to foreclose any claim of justifiable reliance? Would public health organizations and consumers have acted any differently had they been given full disclosure by the tobacco industry? These issues, and more, raise questions which are both complex and important. At this juncture, however, this court must look only to the complaint and decide whether, as alleged, each count of the Funds' complaint states a claim upon which relief can be granted.

Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) can be granted only if defendants demonstrate "beyond a doubt that plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This court must accept as true all well-pleaded allegations of the complaint, *see Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), and all reasonable inferences must be drawn in plaintiffs' favor. *See Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991).

This is a very tough standard. Only because it is so tough will a limited portion of

the complaint—a very limited portion—survive, at least for now. A word of caution, however. Let not the length of this opinion suggest that this court has much confidence that the discrete parts of the three counts which it is compelled to hold in now are going anywhere *beyond* now. *See, e.g.*, nn. 12–14, *infra*. Indeed, even the Funds apparently do not have much confidence in what will remain given their responses at oral argument to more than one of the court's rather pointed and somewhat cynical questions as to how, if at all, they could prove these claims: "We're entitled to get by under Rule 12" (Tr. 82);[7] "you're talking about evidence," *id.* at 95; "[t]his is a Rule 56 issue," *id.*; "[t]his is Rule 12," *id.*

Given the fact that the predominant motion before the court *is* a 12(b)(6) motion and because there are a handful of "well-pleaded allegations" in the complaint by virtue only of the reasonable inferences which at this juncture must be drawn in favor of the Funds, allegations and inferences only slightly amplified in little more than one page of the Funds' brief, the motion to dismiss will be granted in part and denied in part.

### A. Fraud Claim

Count VI of the complaint alleges that defendants intentionally engaged in fraudulent misrepresentations and concealment of the health hazards of smoking and its addictiveness which induced participants to smoke and continue to smoke, causing the Funds to incur increased health care costs. Compl. ¶¶ 297–311. Defendants make two arguments in support of their motion to dismiss Count VI. First, defendants argue that the fraud claim fails because the Funds' injuries, if any, are too remote from defendants' alleged misconduct. Specifically, defendants assert that any fraudulent misrepresentations or concealment by defendants and any injuries or damages incurred because of that misconduct were directed at and suffered by smokers and potential smokers, *not* the health and welfare funds bringing suit here. Second, defendants argue that, aside from what has come to be referred to as "remote-

---

7. "Tr." references the transcript of oral argument held before this court on August 6, 1998.

ness," the Funds' fraud claim has not been pled with particularity, as required by Fed. R.Civ.P. 9(b).

### 1. *Remoteness*

To effectively analyze the issue of remoteness, it is imperative to recognize that the Funds allege misconduct essentially directed at two different groups: participants who smoked and the Funds themselves. Although seeking relief for fraud perpetrated by the defendants against both groups, it is the fraud allegedly directed at the Funds themselves which is the supposed "focus" of the Funds' fraud claim (Tr. 5). Thus, the argument goes, the tobacco defendants aimed misconduct directly at the Funds as providers of health care services to "shield themselves from having to pay the health care costs of tobacco-related diseases and to shift those costs to others, including [p]laintiffs...." Compl. ¶ 307. By virtue of this misconduct, the Funds were prevented from restructuring their health care programs to discourage or reduce tobacco use by their participants. *See* Compl. at ¶ 304 (as a result of defendants' misconduct, the Funds "relied on false or incomplete information in taking or not taking actions to discourage and reduce tobacco use by [p]laintiffs' participants"); Compl. at ¶ 309 (by relying on defendants' misrepresentations and nondisclosures, the Funds' "failed to take or would have taken sooner actions to more appropriately treat tobacco-related injuries and diseases as well as to discourage and reduce cigarette and smokeless tobacco use, and the costs associated therewith").

The Funds' "alternative and distinctly secondary claim" (Tr. at 5) is to recover their increased health care costs due to defendants' fraudulent acts "directed at the [participants as] users of tobacco products." Pl. Opp. Br. at 29. *See, e.g.,* Compl. at ¶ 310 ("participants, and the general public, also relied on the nondisclosures of material facts about tobacco use and health, and were thereby induced to purchase, smoke (or chew) and become addicted to Defendants' deadly and defective products, to the detriment of Plaintiffs and members of the Class"); Compl. at ¶ 307 ("[d]efendants'

fraudulent statements, concealment and conduct ... was a substantial cause persuading ... participants to purchase and use a deadly and addictive product"); Compl. at ¶ 308 ("[t]he facts concealed by Defendants about tobacco use, health and addiction were material in that a reasonable consumer would have considered them important in deciding whether to purchase and smoke cigarettes"). Parenthetically, the "secondary" nature of the claim of fraud directed at the participants is certainly not apparent to the court given that this claim is where the *real* money is and, thus, dominates the complaint to the virtual exclusion of the claim of fraud directed at the Funds.

Distinguishing between the two groups is crucial in addressing defendants' argument that the Funds' injuries are too remote because, while the claim of fraud directed at the Funds survives—albeit barely—defendants' motion to dismiss, the Funds may not recover for fraud directed at their participants.

### a. *Allegations of Misconduct Directed at Participants*

█ Taking the Funds' "secondary" claim first, the Funds may not recover for any damages incurred due to fraud directed at the Funds' participants because the Funds' injuries are too remote. Proximate cause, a requisite element of any tort claim, *see Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 395 (7th Cir.1993) (elements of a tort claim are duty, breach, proximate cause and injury) (citing to W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 30, at 164–65 (5th ed.1984)), *cert. denied,* 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994), involves two distinct inquiries: (1) foreseeability and (2) "a policy element that encompasses concepts of equity and standing." *Oregon Laborers–Employers,* slip op. at 6. While the Funds' increased health care costs may have been a foreseeable consequence of an alleged fraud levied against participant smokers, not every foreseeable harm is recoverable. Indeed, courts have established parameters by which to determine, as a matter of law,

whether injuries are too remote to warrant recovery.

 It has long been recognized that

[a]s a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. . Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

*Caputzal v. Lindsay Co.*, 48 N.J. 69, 78, 222 A.2d 513 (1966) (citation omitted); *see also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (historically, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover") (citing to 1 J. Sutherland, *Law of Damages* 55–56 (1882)). Proximate cause is "that combination of 'logic, common sense, justice, policy and precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." *Williamson v. Waldman*, 150 N.J. 232, 246, 696 A.2d 14 (1997) (citations omitted).

 One such fixed point is this: one who pays the medical expenses of another may not bring a direct action to recover those expenses from the tortfeasor who caused the increased medical expenses. *See Anthony v. Slaid*, 52 Mass. (11 Met.) 290, 291 (1846) (plaintiff, who agreed to support all of the town paupers, could not recover against defendant for the assault and battery by defendant's wife of one of the paupers, thereby increasing plaintiff's expenses, because the injury was too remote). This rule is tradi-

tionally invoked in the context of insurers who attempt to recover their increased costs directly from the tortfeasor. Courts have consistently disallowed such direct recovery, holding that because the tortfeasor directly harmed the insured individual, the insurer's damages were too remote to be recovered in a direct action.[8] Indeed, as the Second Circuit has observed, "[t]here is not a single reported case in American jurisprudence cited ... or discovered by this court which holds that upon an insurance carrier's payment to its insured, the insurer becomes vested with a claim arising out of an implied contract of indemnity with the tortfeasor who caused the damage necessitating payment by the carrier to the insured." *Great American Ins. Co. v. United States*, 575 F.2d 1031, 1033 (2d Cir.1978) (citing cases from 1890 to 1975).

 This is not to say that insurance companies may not—and do not—recoup losses caused by third-party tortfeasors, but only that their redress is limited to a right of subrogation. A subrogated insurer's right of recovery against a third-party tortfeasor is not inconsistent with what is essentially the rule that an insurer's loss is too remote and not proximately caused by the tortfeasor's acts because the subrogee (the insurer) "steps in the shoes" of the subrogor (the insured). *Chemical Bank of New Jersey Nat. Ass'n v. Bailey*, 296 N.J.Super. 515, 524, 687 A.2d 316 (App.Div.1997), *certif. denied*, 695 A.2d 671, 150 N.J. 28 (1997); *Economy Auto Ins. Co.*, 79 N.E.2d at 858 (subrogation does not violate requirement of proximate cause). Remoteness concerns are not much of a concern at all in the subrogation setting because the insurer may recover against the tortfeasor only if the insured could recover. In other words, the insurer, as subrogee,

---

**8.** *See, e.g., Economy Auto Ins. Co. v. Brown*, 334 Ill.App. 579, 79 N.E.2d 854, 857 (1948) (insurance company could not recover from tavern owner under the Dram Shop Act the payments made to insured drunk driver because the insurer's damages were too "remote and indirect"); *Mobile Life Ins. Co. v. Brame*, 95 U.S. 754, 759, 24 L.Ed. 580 (1877) (insurance company could not recover directly against tortfeasor who shot and killed insured because the insurer's damages were "a remote and indirect result"); *Connecticut Mut. Life Ins. Co. v. New York & N.H.R. Co.*, 25 Conn. 265 (1856) (plaintiff life insurance com-

pany could not sue defendant railroad company for payments made under a policy insuring the life of insured who was fatally injured due to defendant's negligence because the loss to the plaintiff, "although due to the acts of the railroad company, ... was a remote and indirect consequence of the misconduct of the defendants and not actionable[ ]"); *Rockingham Mut. Fire Ins. Co. v. Bosher*, 39 Me. 253, 257, 63 Am. Dec. 618, 620 (1855) (fire insurance company could not recover against tortfeasor who willfully fired a store which carried fire insurance because the loss was remote and indirect).

becomes subject to all defenses that were available against the insured party. *Great American Ins. Co.*, 575 F.2d at 1034 (subrogation is an "exclusively derivative remedy which depends upon the claim of the insured and is subject to whatever defenses the tortfeasor has against the insured"); *Holloway v. State*, 125 N.J. 386, 396, 593 A.2d 716 (1991).

This rule against recovery for remote injuries applies with equal force to the Funds even though they are admittedly distinguishable from traditional insurance companies. The rationale for requiring insurers—and, likewise, the Funds—to stand in the shoes of the insureds—or the Funds' participants—in order to recover their health care costs is to be certain that the tortfeasor is actually responsible for those costs. By allowing direct recovery from a third-party tortfeasor independent of the insured's claims against the tortfeasor, a remote payor could bypass both the causation link between the tortfeasor and the insured who was injured, as well as any defenses that could be raised, and simply recover based on a unilateral declaration by the payor that the tortfeasor did in fact cause the injury to the insured. *See Industrial Risk Insurers v. Creole Prod. Servs., Inc.*, 746 F.2d 526, 528–29 (9th Cir.1984) (refusing to allow an insurance company to avoid the comparative negligence of its insured by bringing an independent indemnity claim against the tortfeasor because it would force the alleged tortfeasor to "pay for losses for which it would not otherwise be liable[ ]").

Furthermore, New Jersey has explicitly recognized the rule against direct recovery for remote payors. In *Holloway*, the Supreme Court of New Jersey held that the

State, which is obligated to pay the medical expenses of its prisoners, did not have an independent cause of action against negligent tortfeasors for the medical expenses it had incurred on behalf of a prisoner injured by a tortfeasor. *Holloway*, 125 N.J. at 395–396, 593 A.2d 716. The State's claim for medical expenses could only be based upon equitable subrogation and could not be viewed as independent of whatever entitlement the injured prisoner would have had against the tortfeasor. *Id.*[9]

■ The Funds, understandably, reject subrogation as a remedy, presumably because they would be forced to step into the shoes of their thousands and, perhaps, tens of thousands of participants who smoked over the years and thereby subject themselves to any and all defenses that the defendants may have against each of the smokers. The Funds have failed, however, to provide a single instance and, indeed, this court has been unable to find a single case, in which health and welfare funds have been exempt from the general rule and have been allowed to directly sue tortfeasors for monies expended in health care costs for their participants. Indeed, contrary to the Funds' contention, the Third Circuit made clear that the trustees of a union health plan had only a right of subrogation to recover from coal mine operators the medical benefits paid to the health plan's black lung claimants. *Connors v. Tremont Mining Co.*, 835 F.2d 1028, 1029 (3d Cir.1987) (finding no federal jurisdiction under ERISA because "[h]aving only rights of subrogation," the right of the trustees to recover did not depend on the plan, but on the Black Lung Benefits Act).[10]

**9.** This court is mindful of *Hedgebeth v. Medford*, 74 N.J. 360, 378 A.2d 226 (1977), in which the Supreme Court of New Jersey found that the New Jersey Medicaid reimbursement statute (N.J.S.A.30:4D–7(j)) provided the State with two "avenues" by which to seek reimbursement for Medicaid payments; namely, "it may either institute *an action directly* against the tortfeasor who is liable for the medical expenses or seek recovery by way of the Medicaid recipient through a right of subrogation." *Id.* at 365, 378 A.2d 226 (emphasis added). This finding does not alter this court's determination that the Funds may not maintain a direct action because, in *Hedgebeth*, the Supreme Court was opining as to a statutory right of recovery. Here, as in *Hollo-*

*way*, the Funds' claim to reimbursement does not stem from a statute.

**10.** This court summarily rejects the Funds' argument that the rule barring direct recovery by remote payors from tortfeasors applies only to negligent torts and not to intentional torts such as fraud. Pl. Opp. Br. at 10–12. The requirement of a direct relationship between an injury and the tortfeasor is as mandatory in the context of intentional torts as it is in the context of negligent torts. Both require proximate cause. Simply because a cause of action for fraud requires intent that the other party rely upon a material misrepresentation or omission does not

As payors of medical expenses, the Funds' injuries are too remote, absent a right of subrogation, to directly sue the defendants—the alleged tortfeasors—for the health care costs incurred due to misconduct aimed at their participants. Therefore, insofar as the Funds allege misconduct directed at participants or smokers, the Funds' fraud claim cannot stand.

### b. *Allegations of Misconduct Directed at the Funds*

■ Although nearly all of the Funds' massive complaint addresses misconduct levied against participants and smokers, parsing through Count VI this court has managed to tease out from the complaint the claimed "focus" of the Funds' fraud claim: a claim of fraud directed at the Funds themselves. As noted above, the Funds assert that for the purpose of shifting health care costs from themselves, defendants aimed misrepresentations and nondisclosures directly at the Funds intending that the Funds would rely upon those representations (or lack thereof) in structuring their health care programs. Because the Funds relied on those misrepresentations and nondisclosures, the Funds failed to treat tobacco-related injuries and diseases and failed to discourage and reduce tobacco use, and the costs associated therewith. The imposition of these health care costs damaged the institutional interests of the Funds by "diminish[ing] the assets of the Funds and depriv[ing] the participants as a whole of resources to pay for health care benefits." Pl. Opp. Br. at 9.

Injuries premised upon misconduct directed at the Funds cannot be dismissed as remote because the Funds are not suing on behalf of their participants to recover for smoking-related injuries that the participants sustained, but are suing to recover for the economic injuries that they, as health care organizations, suffered due fraudulent conduct directed at them. Proximate cause is no longer a hurdle and subrogation would be inappropriate because the Funds' claims are

independent of any misrepresentation toward, or reliance by, smokers.

Defendants argue, however, that the Funds' "purported 'direct' claim" must be rejected because it is simply a recharacterization of the fraud claim vis-a-vis the Funds' participants as to which the Funds cannot recover as remote payors. Def. Br. at 17; Tr. 24–25; Def. Reply Br. at 4. Moreover, defendants argue, "in the absence of participants who purchased and smoked cigarettes . . ., the Funds have no legally cognizable injuries regardless of their now asserted failure to take action to 'protect' themselves." Def. Reply Br. at 4; Tr. 34–35 (the Funds' claims "fall on the remoteness doctrine because all of the[ir] injury is still derivative and derives through the individual smokers who were injured"). This court will take each of these concerns in turn.

First, fraud against the Funds in order to shift health care costs onto the Funds is a separate claim—involving different considerations as to each element of the offense—than that of fraud against participants in order to encourage them to begin or continue smoking. Fraud against participants would require, for example, proof of justifiable reliance by the participants. Reliance by participants, however, is irrelevant to a claim of fraud against the Funds themselves and whether the Funds justifiably relied by failing to institute smoking cessation programs or impose other cost-saving mechanisms. Defendants are simply incorrect in saying that "[t]he fraud or deception that [the Funds] allege [was] directed at them [requires that] the smoker . . . be deceived by the fraud." Tr. 24.

Secondly, the fact that the bulk of the Funds' injuries stem directly from injuries suffered by participants does not make the Funds' claim of injuries from fraud as to them any less direct. An example is helpful. Supposing the inventor of Procedure X approached the Funds and informed them, in order to persuade them to offer health insurance coverage for Procedure X, that it is

---

mean that the Funds can side-step proving causation between the participant smokers and the defendants and move right to a direct claim against the defendants for any and all damages

they allege they incurred. Moreover, the seminal case of *Anthony v. Slaid* itself involved an intentional tort. *See Anthony v. Slaid,* 52 Mass. at 290.

perfectly safe. Relying on the representation made by the inventor, the Funds offer coverage to their participants for Procedure X. As it turns out, however, Procedure X is extremely dangerous and causes numerous health problems which its inventor knew it would when he or she fraudulently represented its safety to the Funds. The damage to the Funds' business as a result of this fraud would be the money the Funds lost as a result of relying upon the misrepresentation. The fact that those costs would stem from the injuries suffered by the Funds' participants would not make the Funds' fraud claim any less direct or actionable.

Here, the allegations of fraud directed at the Funds are significantly less impressive than the allegation in the above example and, indeed, are not very impressive at all. However, because—and only because—this motion is brought pursuant to Fed.R.Civ. P.12(b)(6), those allegations state a claim.

Accordingly, the Funds' claim that fraud was directed against them will not be dismissed on the ground that the Funds' injuries are too remote.

### 2. Particularity

■ The Funds' claim that defendants perpetrated a fraud directly upon the Funds, although not remote, must still be pled with particularity pursuant to Fed.R.Civ.P. 9(b).[11] The elements of fraud are

(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on

it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997).

■ The Funds allege that for decades defendants knowingly made material misrepresentations and omissions (Compl. ¶ 300) as to, among other things, the addictiveness of nicotine (Compl. ¶ 53), the link between cancer and tobacco (Compl. ¶ 140), whether defendants manipulated the nicotine levels in their products (Compl. ¶¶ 192–94), whether defendants added ammonia to enhance nicotine absorption (Compl. ¶ 173), and whether defendants bred special tobacco plants which yielded higher levels of nicotine (Compl. ¶¶ 166–71). Again, as teased out above, defendants sought to induce the Funds to rely upon these misrepresentations in order to "shield themselves from having to pay the health care costs of tobacco-related diseases and to shift those costs to others, including [p]laintiffs...." Compl. ¶ 307. By reasonably relying on defendants' misrepresentations and nondisclosures, the Funds allegedly "failed to take or would have taken sooner actions to more appropriately treat tobacco-related injuries and diseases as well as to discourage and reduce cigarette and smokeless tobacco use, and the costs associated therewith[.]" Compl. ¶ 309.

While the Funds will assuredly have a hard time demonstrating that defendants' intent in misrepresenting or concealing information was to dupe the Funds into paying for health care (as opposed to duping consumers into smoking or into continuing to smoke),[12] *and* that the Funds' reliance was

---

11. Heightened pleading requirements are necessary in order to "give[] defendants notice of the claims against them, provide[] an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997); *see also Red Ball Interior Demolition Corp. v. Palmadessa,* 908 F.Supp. 1226, 1238 (S.D.N.Y.1995).

12. The Funds must establish, most likely sooner rather than later given defendants' promised motion for summary judgment, Def. Br. at 15, that defendants did in fact *intend* that the Funds, in particular, would rely upon any misrepresentations and concealment. Fraud, or course, re-

quires such intent. *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1182 (3d Cir.1993). Although the Funds need not show that false statements were made directly to them, they must establish defendants' intent that any false statements be communicated to and relied upon by the Funds. *Parker Precision Prods. Co. v. Metropolitan Life Ins. Co.,* 407 F.2d 1070, 1076 (3d Cir.1969) (stating New Jersey law).

This court was, from the outset, skeptical of the Funds' bald and conclusory allegation that the defendants' intent in misrepresenting and/or concealing was to shift and avoid health care costs. Compl. ¶ 307. It remains skeptical. In *this court's* mind, this shifting of health care costs could not have been the defendants' intent at the time the misrepresentations were made or

justifiable in light of widely-available infor- mation about the dangers of tobacco,[13] *and*

information concealed because payment of such costs would not have been the responsibility of the defendants had they been forthright. Stated somewhat differently, if defendants had fully and accurately disclosed the facts, the Funds, according to them, would have instituted adequate smoking cessation programs to decrease their costs due to smoking related illnesses (thereby eliminating the costs of which the Funds complain) or individual smokers would have assumed the risk of smoking while being fully informed of its dangers. Either way, defendants would have had no health care costs to "shift."

In response to this court's skepticism, at oral argument the Funds explained their theory of intent: namely, that the defendants intended that the Funds would rely upon the fraudulent misrepresentations and concealment in order to shift to the Funds the responsibility that the defendants retained for health care costs under strict products liability (presumably under a defective design theory). Tr. at 86. The Funds argued that in the normal workings of the marketplace, the price of a product includes the medical costs associated with the product and the liability costs for which a manufacturer can assume it will be liable under strict products liability. Tr. at 79, 86. By fraudulently misrepresenting and concealing the dangers of tobacco, the theory goes, the defendants were able to shift onto the Funds the costs for which they would normally have been liable under strict products liability and would normally have built into the costs of their products. *Id.*

It will undoubtedly be difficult, if not impossible, for defendants to prove this abstract if not altogether tenuous theory of intent. First, preliminary research indicates that, although by 1962 the *Restatement (Second) of Torts* was beginning to expand the concept of strict liability in response to Dean Prosser's 1960 article, *The Assault upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099 (1960), strict products liability did not receive its first "full judicial sanction" until 1963. Marshall S. Shapo, *The Law of Products Liability*, ¶ 7.01[2] at 7–3 & 7–4 (1987) (referring to *Greenman v. Yuba Power Prods., Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963)). The Funds are seeking damages dating back to the 1954 "Frank Statement to Cigarette Smokers," Tr. at 15, a point in time at which the defendants could not have intended to avoid the costs of strict products liability because such a theory of liability had not yet been established.

That aside, although at this juncture general averments of intent are sufficient under Fed. R.Civ.P. 9(b), the Funds—again, sooner rather than later—will have to provide more than what amounts to conclusory allegations to refute the clear and, perhaps, singular inference that can be drawn from the facts alleged: that defendants' intent in concealing or misstating information was to induce consumers to either begin or continue smoking. The complaint painstakingly describes numerous internal memoranda allegedly evidencing the intent of the defendants to conceal pertinent research from the public and to misstate the hazards of smoking in their advertisements. Conspicuously missing are any factual allegations supporting the Funds' assertion that the defendants intended to target the Funds as opposed to consumers in order to avoid being straddled with the costs associated with strict products liability or anything else. In response to this court's concerns regarding intent, the Funds provided the court with two, albeit scarcely relevant, documents. One document showed that the defendants were aware of economic arguments against cigarettes stemming from rising health care costs and anticipated preparing a counter argument. Another document, prepared by a consultant to the Tobacco Institute, illustrated a strategy to discourage non-smoker discounts in health insurance premiums as well as cost containment programs such as smoking cessation clinics and workplace smoking policies. Labor union negotiators were listed, among others, as the targeted audience for such insurance program strategies. Although these two documents may be enough to persuade this court that rising health care costs, disparate health insurance programs, and maintenance of the status quo were within the contemplation of defendants, the Funds will have to show more than this to establish that defendants' intent was specifically to target the Funds so as to avoid strict products liability costs. At this point, however, this court cannot say that the Funds "can prove no set of facts which would entitle [them] to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

**13.** More than any other element of the fraud claim, this court finds it difficult, if not impossible, to imagine how the Funds will survive a motion for summary judgment with respect to justifiable reliance. The reasonableness of the Funds' reliance will obviously be evaluated in light of the widely available information regarding the dangers of nicotine and tobacco. The Funds themselves note the published studies dating back to the 1950s that associated smoking with lung cancer. Compl. ¶ 80. United States Surgeon General reports surfaced as early as 1964. Moreover, very recently Justice Ernst Rosenberger of the Appellate Division of the New York Supreme Court painstakingly described the implausibility of a claim of ignorance as to the addictive quality of nicotine. *See Small v. Lorillard Tobacco Co., Inc.*, 677 N.Y.S.2d 515, 520-21 (1st Dept.1998) (noting the hundreds of articles and public statements by the government and public health industry addressing the highly addictive nature of nicotine, as well as the publicizing in 1969 of Congress's suspicions that cigarette manufacturers were adjusting nicotine levels to ensure that smokers would be unable to quit). Justice Rosenberger deemed the tobacco industry's practices "duplicitous" but not "carefully hidden from the public." *Id.* at 521.

that their costs would in fact have been reduced but for the defendants' misrepresentations and omissions,[14] for purposes of this motion to dismiss, this court must accept the allegations of the complaint as true. *Cruz,* 405 U.S. at 322, 92 S.Ct. 1079. At this early stage, as the Funds have reminded this court, *see* pp. 328–329, *supra,* "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* While recovery here is certainly "very remote", the fraud claim is set forth—again, just barely—with sufficient particularity.

## B. *RICO Claims*

The Funds also bring federal civil RICO claims (Counts I and II), pursuant to 18

Furthermore, the Funds' position as sophisticated health care providers who presumably monitored government warnings, medical studies and Surgeon General reports would also weigh against a finding of justifiable reliance. Put simply, as dishonest and unscrupulous as the tobacco industry's conduct may have been, the Funds cannot recover absent justifiable reliance.

14. The Funds will also face an uphill road in proving that they relied to their detriment. According to the Funds, had they known the truth about tobacco and nicotine, they would have reduced their health care costs by

[1] limiting smoking-related disease or excluding it from coverage; [2] imposing cost sharing requirements (e.g. deductibles and co-payments) on participants who smoke; [3] requiring smokers to participate in cessation programs; [4] or requiring participants at risk for smoking to participate in smoking prevention programs.

Pl. Opp. Br. at 9. Each assertion appears dubious at best. First, the Funds admitted at oral argument that they were uncertain whether union health funds which are "non-profit trusts existing solely for the benefit of [their participants]" (Pl. Opp. Br. at 8) *could* exclude smoking related disease from coverage and noted that some jurisdictions have precluded such exclusions as discriminatory. Tr. at 92. Furthermore, the Funds' failure to impose cost-sharing programs, e.g. requiring smokers to pay higher deductibles, could not have "diminish[ed] the assets of the Funds and deprive[d] the participants as a whole of resources to pay for health benefits," Pl. Opp. Br. at 9, because if the smokers paid more and

U.S.C. §§ 1962(a),(c),(d), based upon defendants' alleged conspiracy to engage in a pattern of fraudulent behavior including transmissions by mail and wire. Compl. ¶¶ 215–236.[15] Defendants do not argue that the Funds have not alleged an enterprise or the requisite pattern of racketeering activity, arguing, rather, that Counts I and II must be dismissed because, again, the Funds' injuries are too remote and the Funds have not suffered an injury to business or property.

### 1. *Remoteness*

Because the Funds suggest (Tr. 9, 38) that a statutory claim would be exempt from the general principles concerning remote injuries enunciated in *Anthony v. Slaid* and *Holloway* and discussed at some length above, this court will again review those principles in light of the RICO claims.

 Proximate cause is a requirement for any civil RICO claim, *Holmes,* 503 U.S. at

the non-smokers paid less, the Funds would still have the same amount of money available.

Finally, the Funds' assertion that they would have instituted smoking cessation and prevention programs absent defendants' misconduct—the Funds' strongest argument, they believe—is specious given that even *now,* in 1998, years after the "smoking guns" have come to light, the Funds have still not instituted one such program. Tr. at 89.

The speculative and hypothetical nature of the Funds' asserted damages may also prove highly problematic. *See Seafarers,* slip op. at 21–22 (in order to determine the Funds' damages, "it would be necessary to determine what impact the Funds' hypothetical steps would have had on the smoking habits of their participants, had they been hypothetically implemented"). Even though precision is not required, the Funds must still prove their damages with "a reasonable degree of certainty." *See Lightning Lube,* 4 F.3d at 1176 (citing to *Tessmar v. Grosner,* 23 N.J. 193, 128 A.2d 467 (1957)). "Damages which are merely speculative and contingent are not recoverable." *Scotton,* 32 Del. 192, 121 A. 180, 183 (Super.Ct.1923) (citing to *Griffin v. Colver,* 16 N.Y. 489, 491, 69 Am.Dec. 718 (1858); *Brigham v. Carlisle,* 78 Ala. 243, 249, 56 Am.Rep. 28 (1884)).

15. Count I of the complaint, alleging a violation of 18 U.S.C. § 1962(c) and (d), is not asserted against the Council for Tobacco Research, the Tobacco Institute, or Smokeless Tobacco Council, Inc. Count II, alleging a violation of 18 U.S.C. § 1962(a) and (d), is asserted against all defendants.

268, 112 S.Ct. 1311, and is to be "interpreted narrowly." *Lilly and Co. v. Roussel Corp.,* —— F.Supp.2d. ——, ——, 1998 WL 377730 at *20 (D.N.J. July 7, 1998). In the context of a RICO claim, the Supreme Court has explicitly stressed "directness" as one of the central elements of proximate cause. *Holmes,* 503 U.S. at 269, 112 S.Ct. 1311. The purpose of requiring the injury to be direct is threefold: (1) "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors[;]" (2) "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among the plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries[;]" and (3) an expansive view of causation is not necessary because "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70, 112 S.Ct. 1311. (citations omitted). As with common-law fraud, plaintiffs are seeking to recover under RICO for fraud directed at their participants as well as for fraud perpetrated directly against the Funds. Again, while the latter theory is viable, the former is not.

### a. *RICO Premised Upon Fraud Directed at the Participants*

■ The Funds may not recover for defendants' wrongful conduct directed at the participants because proximate cause cannot be established. Application of each of the *Holmes* factors supports this conclusion.

First and foremost, it would be difficult if not impossible to ascertain the amount of the Funds' damages which are due to defendants' conduct as opposed to independent factors. *See Holmes,* 503 U.S. at 269, 112 S.Ct. 1311. For starters, the Funds would have to ascertain what proportion of their health care expenses were spent on health problems actually caused by smoking as opposed to those caused by environmental hazards, consumer products other than tobacco, a person's genetic makeup or predisposition to cancer and other diseases, employment-related chemicals, and other independent sources. Assuming that such tobacco-related health care costs were ascertainable, a damage calculation would be further complicated by the fact that the Funds could only recover for the tobacco-related health care costs that the Funds incurred due to the participants' justifiable reliance on defendants' misrepresentations rather than on other reasons. Because the Funds are at least one step removed from any fraud on their participants, they simply cannot speak to which participants heard the misstatements, which ones listened, and which ones had full knowledge of the risks and nonetheless chose to smoke. Again, as discussed with reference to Count VI, allowing the Funds to recover for fraud levied upon the participants because the Funds suffered resultant increases in medical costs would allow the Funds to bypass all of the difficult factual causation issues in smoker cases and hold defendants liable simply by virtue of the Funds' unilateral conclusion that they incurred expenses to pay the health care costs for some participants, never mind which ones, who were actually injured by defendants' fraudulent conduct.

The second reason for barring recovery for indirect injuries, namely the risk of multiple recoveries, also weighs against the Funds. *Id.* The Funds argue that there is no risk of multiple recoveries because only the Funds can recover the increase in medical expenses that they incurred due to tobacco-related injuries. The Funds, however, are financed by contributions from employers in accordance with collective bargaining agreements negotiated by the various unions. Pl. Opp. Br. at 7. The participants, through their unions, negotiate to have their employers contribute to the Funds for health care coverage in lieu of receiving that money as wages. *See United Mine Workers of America Health and Retirement Funds v. Robinson,* 455 U.S. 562, 571, n. 10, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982) (payments by employer to Funds is essentially part of employees' compensation). The numerous links in the chain of causation create a risk of multiple recoveries or, at the very least, a quagmire of apportionment problems. Under the Funds' reasoning, they should be allowed to recover because they

expended more for health care costs than they otherwise would have were it not for defendants' misconduct. It follows that so, too, could the employers recover because the misconduct of the defendants resulted in employers being forced to contribute more to the Funds and less to the employees in the form of wages when the employers, for various reasons, might well have preferred to go the wages route. And, of course, under this reasoning, the participants, and not just smokers but all union members, could recover the wages they did not receive—and might well have preferred to receive—because of contributions to the Funds to cover the increased health care costs caused by defendants' misconduct. The risk of multiple recoveries is very real, indeed.

At oral argument, the Funds pointed to *Firestone v. Galbreath*, 976 F.2d 279 (6th Cir.1992), as well as *Witzman v. Gross*, 148 F.3d 988 (8th Cir.1998), and argued that there was no risk of multiple recoveries because, under principles of trust law, the participants, as beneficiaries of a trust fund, could not bring suit. These cases are distinguishable. In both, the courts refused to allow a beneficiary to sue a tortfeasor for misconduct levied at the trust fund because the beneficiary was only indirectly injured. *See Firestone*, 976 F.2d at 286 (finding that the beneficiaries did not have standing to recover for a decrease in the trust corpus because the misconduct was visited upon the creator of the trust); *Witzman*, 148 F.3d at 990 (holding that beneficiaries could not sue attorneys of the trust for legal malpractice because "beneficiaries are not direct recipients of the attorney's services"). Under the theory of recovery being pressed here, defendants' misconduct was not directed at the trust corpus but at the participants themselves. Therefore, the participants would not be seeking to recover for the indirect injury prohibited by *Firestone* and *Witzman*.

Finally, recovery by plaintiffs with remote injuries such as the Funds is unnecessary because defendants' injurious conduct could be deterred by those more directly injured acting as private attorneys general. *Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311. Insofar as the Funds are seeking to recover for fraud levied upon participants, the individuals directly injured by defendants' alleged misrepresentations and nondisclosures were the smokers themselves who contracted tobacco-related illnesses. Suits by smokers against the defendants, with the Funds joining as subrogees to recover the health costs expended, would vindicate the law, allow those directly injured to recover, and resolve the difficult causation and apportionment problems.

This court is also unpersuaded by the argument that there is no risk of multiple recoveries because the participants could not bring RICO claims. Caselaw, indeed, suggests that participants may not be able to bring RICO claims, even to recoup expenses, because their injuries stem from personal injuries. *See Allman v. Philip Morris, Inc.*, 865 F.Supp. 665, 668 (S.D.Cal.1994) (smokers could not recover even though they were seeking "only damages for the out-of pocket expenses they incurred in treating their addictions, specifically the cost of the Nicotine Patch and related medical expenses[ ]" because the pecuniary consequences of personal injuries are not recoverable ·under RICO); *Ehrich v. B.A.T. Indus., P.L.C.*, 964 F.Supp. 164, 167 (D.N.J.1997) (following *Allman* and rejecting smokers' RICO claims because financial injury was only "incidental" to smokers' core medical injury). Even if this be so, however, participants could bring suit under a different theory of liability such as common-law fraud or products liability in order to "vindicate the law." [16]

---

16. The Funds direct this court's attention to the Supreme Court's decision in *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), as support for their assertion that the proximate cause element of their RICO claim has been properly pled. Pl. Opp. Br. at 11, 15–16. In *NOW*, however, the Court simply held that a claim under § 1962(c) does not require proof that the racketeering enterprise be motivated by an economic purpose. *Id.* at 262, 114 S.Ct. 798. No such issue exists in this case. Indeed, even the defendants do not suggest that, whatever they may or may not have done, they were not at all times motivated by an economic purpose.

Accordingly, the Funds cannot recover under RICO for fraud directed at their participants.[17]

### b. *RICO Premised upon Fraud Directed at the Funds*

■ The Funds do, however, state a claim for RICO premised upon fraud aimed directly at the Funds. Application of the *Holmes* factors illustrates that proximate cause is not an insurmountable hurdle.

With reference to the first *Holmes* factor, it is at least possible that the Funds can develop a reliable statistical model of what percentage of the Funds' health care costs stem from tobacco as opposed to such things as environmental hazards or genetic disposition. To the extent that the Funds' RICO claims allege fraud against the Funds themselves, reliance by the participants or any defenses the defendants would have against the participants would be irrelevant. Instead, damage calculations would take into account reliance by the Funds, the probability that the Funds would have done anything differently had they been fully informed, and the probability of success of any such hypothetical steps. In addition, there would be no risk of multiple recoveries because if, for example, the Funds could prove that the fraud was directed at them in order to shift health care costs, no other party could sue to recover such costs. Although the participants would certainly have an interest in any increased costs, under trust law the participants would be only indirect victims of—and could not sue for—misconduct directed at the trust corpus. *See Firestone,* 976 F.2d at 286; *Witzman,* 148 F.3d at 990. Finally, the Funds, to the extent that they claim injuries, could be counted on to vindicate the law. Indeed, as trust funds, they would be obliged to bring suit. *See Uselman v. Uselman,* 464 N.W.2d 130, 137 (Minn.1990) ("If a third person commits a tort against trust property, the trustee has a duty to take reasonable steps to compel the tortfeasor to redress the injury.").[18]

### 2. *Injury to Business or Property*

■ Because the Funds are able to bring RICO claims alleging fraud directed at the Funds themselves, this court must briefly address defendants' second challenge to the

---

**17.** Because the Funds cannot establish proximate cause, a requisite element for any RICO claim, this court need not at this point reach the question of whether the Funds suffered injury to their business or property although it will do so in the context of the Funds' direct RICO claim.

**18.** Because the Funds, as trusts, have an obligation to seek redress from tortfeasors who injure the trust corpus, this court finds the reasoning of the Honorable John P. Fullam in *Steamfitters,* 1998 WL 212846 to be unpersuasive. *See also Seafarers,* slip op. at 5–9, (adopting Judge Fullam's analysis). Judge Fullam slip op. dismissed the complaint in a recent suit brought by the health and welfare funds of Pennsylvania against the tobacco companies because "all of plaintiffs' claims suffer from [a] fundamental flaw, namely, the fact that plaintiffs have not suffered any cognizable damages." *Steamfitters,* 1998 WL 212846 at *2. Judge Fullam went on to explain that the funds were not damaged because "[t]he fact that the medical costs paid out of these funds increased because of defendants' wrongdoing caused no harm to plaintiffs; it merely meant that the unions negotiated a greater level of contributions from the employers." *Id.*

This court does not agree that the Funds cannot sue because they were "merely handling the payments with money provided by others," *id.,* and, being non-profit entities, they "cannot claim to have suffered any economic loss in the form of lost profits." *Id.* Under this reasoning, the Funds would always be foreclosed from bringing an action because they always recoup their costs. In light of the obligation of a trust fund to seek redress for injury to the trust corpus, *Uselman,* 464 N.W.2d at 137, as well as the numerous non-tobacco related actions which have been brought by union funds, this simply cannot be the case. *See, e.g., Painters of the Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse,* 879 F.2d 1146 (3d Cir.1989) (employee welfare fund and its trustees brought action against fund's former auditor alleging breach of fiduciary duty, breach of statutory duty, breach of contract, and negligence); *Trustees of the Hotel Employees and Restaurant Employees Int'l Union Welfare Pension Fund v. Amivest Corp.,* 733 F.Supp. 1180 (N.D.Ill. 1990) (fund sued former investment manager for violations of ERISA, securities fraud and common law tort claims); *Local No. 682 Health and Welfare Trust Fund v. Whiting,* 1992 WL 799413 (E.D.Mo. May 19, 1992) (fund brings action under CERCLA, strict liability for abnormally dangerous activity, and continuing trespass due to defendants' burial of hazardous water on property now owned by the funds); *New Orleans Sheet Metal Workers' Local 11 Health and Welfare Fund v. ABC Ins. Co.,* 1990 WL 103118 (E.D.La. July 16, 1990) (remanding legal malpractice claim by funds against former lawyer and his insurance company to state court).

RICO claims, i.e. that the Funds' injuries cannot be recovered under RICO because their injuries stem from the personal injuries of the participants. The Funds may recover under RICO but only if they have been injured in their "business or property" by the conduct constituting the violation. *See* 18 U.S.C. § 1964(c).

Because the Funds may only recover the damages they suffered, as health care organizations, due to being misled about the dangers of smoking, not reimbursement for the personal injuries suffered by their participants, the Funds' alleged injury is to their "business or property". Again, the Funds claim that they relied upon defendants' misrepresentations and failed to effectively help their participants stop smoking and/or failed to restructure their business so as to reduce their costs due to tobacco related injuries. As a result, their business was injured. Simply because the Funds' business is to provide health care for injuries to persons does not mean that an injury to their business is deemed to be a personal injury.

Therefore, insofar as the Funds allege that they were directly defrauded, the Funds' RICO claims will not be dismissed, at least at this stage. It is absolutely clear, however, that the difficulties this court anticipates with respect to the Funds' common law fraud claims, *see supra* nn. 12–14, apply with equal force to the RICO claims.[19]

### C. *Antitrust Claims*

The Funds also assert antitrust claims (Counts III and IV) pursuant to section 1 of the Sherman Act, 15 U.S.C. § 1, and the New Jersey Antitrust Act, N.J.S.A. 56:9–1, *et seq.* Compl. ¶¶ 237–72. To maintain an antitrust claim, be it federal or state, the Funds must show that defendants conspired to unreasonably restrain trade or commerce. *See* 15 U.S.C. § 1; N.J.S.A. 56:9–3.[20] The Funds allege that defendants conspired to restrain trade in the market for cigarettes, nicotine and addiction dependency products as well as in the health care market. Compl. ¶ 238. More specifically, the Funds allege that defendants conspired to eliminate competition and disseminate incorrect information re-

**19.** It bears mention that there is a split between various courts as to whether reliance is a necessary ingredient of proximate cause when a RICO violation is predicated on mail or wire fraud, and the Third Circuit has not yet definitively spoken. The majority of courts, however, require reliance, a requirement that seems eminently sensible. *See, e.g., Chisolm v. TranSouth Finan. Corp.,* 95 F.3d 331, 337 (4th Cir.1996) (holding that in the context of mail and wire fraud, a "plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentations"); *Central Distributors of Beer, Inc. v. Connecticut,* 5 F.3d 181, 184 (6th Cir.1993) ("[Plaintiff] cannot maintain a civil RICO claim against these defendants absent evidence that the defendants made misrepresentations or omissions of material fact to [plaintiff] and evidence that [plaintiff] relied on those misrepresentations or omissions to its detriment."), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2678, 129 L.Ed.2d 812 (1994); *Metromedia Co. v. Fugazy,* 983 F.2d 350, 368 (2d Cir.1992) (noting that "[i]n the context of an alleged RICO predicate act of mail fraud, we have stated that to establish the required causal connection, the plaintiff was required to demonstrate that the defendant's misrepresentations were relied on[ ]"), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Pelletier v. Zweifel,* 921 F.2d 1465, 1499–1500 (11th Cir.1991) ("when the alleged predicate act is mail or wire fraud, the plain tiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme."), *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991); *Curatola v. Ruvolo,* 949 F.Supp. 223, 225 (S.D.N.Y.1997) ("When mail fraud is pled as a RICO predicate act, to establish the required causal connection a plaintiff must show reliance on the defendant's misrepresentations and injuries caused by that reliance."); *but see Akin v. Q–L Investments, Inc.,* 959 F.2d 521, 533 (5th Cir. 1992) ("Plaintiffs' problems of proof with respect to securities fraud do not necessarily haunt their claim of mail fraud [as a RICO predicate act] since reliance is not an element of mail fraud."); *Prudential Ins. Co. of America v. United States Gypsum Co.,* 828 F.Supp. 287, 294 (D.N.J.1993) ("declin[ing] to read into RICO mail fraud cases a requirement of actual detrimental reasonable reliance"); *Sebago, Inc. v. Beazer East, Inc.,* 18 F.Supp.2d 70, at 82 (D.Mass.1998)(same).

**20.** This court's analysis of the Funds' federal antitrust claim applies with equal force to the Funds' state antitrust claim. Neither party disputes that "the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." *State v. New Jersey Trade Waste Ass'n,* 96 N.J. 8, 19, 472 A.2d 1050 (1984)(citing to N.J.S.A. 56:9–18); *see also* Pl. Opp. Br. at 27; Def. Br. at 17.

garding the quality, safety and composition of tobacco products which, in turn, restricted consumers' choices by preventing the development of alternative safer products. Compl. ¶ 241. A foreseeable consequence of defendants' conduct, the argument goes, was an increase in the amount of medical expenses for which the Funds were responsible. Compl. ¶ 250.

■ The Funds' antitrust claims will be dismissed because the Funds do not have antitrust standing to bring such claims. Synthesizing the Supreme Court's analysis in *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Third Circuit has enunciated the following factors relevant to determining whether a party has standing to bring an antitrust claim:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.,* 118 F.3d 178, 181 (3d Cir.1997) (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1165–66 (3d Cir.1993) (hereinafter *"Lake Erie "*), *cert. denied,* 510 U.S. 1091, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994)). Antitrust injury, the second factor listed, is, however, more than a factor; it is a necessary condition of antitrust standing. *Id.* at 182 ("antitrust injury is more than a component to be factored in a standing analysis, it must be present in every case") (quoting *Lake Erie,* 998 F.2d at 1166). If the Funds have not suffered injury of the type that the antitrust laws were intended to redress, i.e. antitrust injury, the Funds do not have standing to bring their antitrust claims.

■ To establish antitrust injury, the Funds "must prove more than injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* Even assuming, as the Funds allege, that defendants engaged in anticompetitive behavior, as opposed to simply tortious acts, *see Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (federal antitrust laws do not "purport to afford remedies for all torts committed by or against persons engaged in interstate commerce") (citation omitted), that affected the quality of the goods they produced, *see Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 641 (3d Cir. 1996) (antitrust injuries "affect[ ] the price[ ], quantity or quality of goods or services") (citation omitted), the Funds have not suffered antitrust injury because they are not competitors or ₁consumers in the relevant market, nor are their injuries "inextricably intertwined" with the purported antitrust violations. *See Gulfstream III Assoc., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 429 (3d Cir.1993).

The relevant market here is the market for tobacco and tobacco-related products. Because the Funds are neither consumers nor competitors in this market, they have not suffered an injury of the type which the antitrust laws are intended to remedy. *See Barton & Pittinos,* 118 F.3d at 181. Not giving up so easily, however, the Funds assert that defendants restrained trade in the health care market (Compl. ¶¶ 255–61). That is simply not so. The only market in which defendants participate—or have ever participated—is the tobacco and tobacco-related products market. Defendants have never provided health care nor could their actions be said to have been aimed at unreasonably restraining the health care market. Indeed, restraining the health care market would be antithetical to defendants' *raison d'etre* be-

cause, if anything, defendants would want smokers to have accessible, affordable and more than adequate health care so that they would continue to smoke. Furthermore, any harm caused to those in the health care market by defendants' supposed anticompetitive acts of suppressing product innovation and development is purely secondary to the direct harm allegedly inflicted upon the consumers and competitors in the tobacco and tobacco-related products market.

Nor have the Funds established antitrust injury by pointing to "a 'significant causal connection' such that the harm to the plaintiff[s] can be said to be 'inextricably intertwined' with the antitrust conspiracy." *See Gulfstream III Assoc.*, 995 F.2d at 429 (citing to *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 978 F.2d 1318, 1328 (3d Cir.1992), *cert. denied*, 507 U.S. 988, 113 S.Ct. 1588, 123 L.Ed.2d 154 (1993)). Again, there is no "significant causal connection" because the Funds, as participants in the health care market, are only indirectly affected by the alleged antitrust conspiracy. As the Honorable Malcolm F. Marsh recently noted:

> [t]o establish causation ... plaintiffs would have to show that had defendants produced safer cigarettes, or allowed others to do so, plaintiffs' participants would have purchased them and would have suffered fewer health care costs resulting in a savings to the plaintiffs.

*Oregon Laborers–Employers*, slip op. at 12. It simply cannot be the case that the Funds' injuries are "inextricably intertwined" with any antitrust conspiracy alleged here.

The Funds rely most heavily on *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), in arguing that because the antitrust statute is a broad remedial statute, they have suffered antitrust injury. The Funds' reliance on *McCready* is misplaced. While the *McCready* Court noted the expansive language of the federal antitrust act, *Id.* at 473, 102 S.Ct. 2540, it specifically limited the availability of an antitrust remedy because "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover three-fold ...." *Id.* at 477, 102 S.Ct. 2540. Rather, antitrust standing is limited to "particular classes of persons and for redress of particular forms of injury." *Id.* at 473, 102 S.Ct. 2540. Because the plaintiff was a *consumer* of psychotherapy services entitled to financial benefits under her Blue Shield plan, she was "within the area of the economy ... endangered by" Blue Shield's selective refusal to reimburse plan members for the services of psychiatrists and not for psychologists and could maintain an antitrust action. *Id.* at 480–81, 102 S.Ct. 2540. Here, the Funds are not consumers in the market for tobacco products any more than they are defendants' competitors in that market.

Finally, while the Funds are fond of selectively pointing to tobacco cases across the country which support their arguments, they have not pointed to one case involving union health and welfare funds in which their arguments have been accepted. Indeed, courts have consistently found—and in the context of the recent barrage of tobacco suits filed across the country consistencies are few and far between—that union health and welfare funds do not have standing to bring federal or state antitrust claims. *See, e.g., Oregon Laborers–Employers*, slip op. at 14 (holding that "plaintiffs cannot meet the standing or proximate causation requirements necessary to maintain an antitrust claim"); *Seafarers*, slip op. at 26–28 (dismissing federal and state antitrust claims in part because of plaintiffs' lack of antitrust injury and standing); *Steamfitters*, 1998 WL 212846 at *3 (dismissing federal antitrust claim because "[p]laintiffs do not have antitrust standing, and they allege no injury of the sort the antitrust laws were designed to prevent"); *Southeast Florida Laborers*, 1998 WL 186878 at *5–6 (dismissing federal and state antitrust claim for lack of antitrust injury because fund was "neither a consumer nor a competitor in the market in which trade was restrained"); *Laborers Local 17*, 7 F.Supp.2d at 289-90 (dismissing federal and state antitrust claims for lack of antitrust standing because funds were not in the "target area" of the alleged antitrust violation); *but see West Virginia Laborers' Fund* (summarily denying defendants' motion to dismiss).

The Funds' antitrust claims will be dismissed by this court as well.

### D. *Breach of a Special Duty*

Count VII of the complaint, which alleges that defendants intentionally breached a voluntarily assumed special duty, will also be dismissed. The Funds allege that defendants assumed a special duty by issuing statements beginning with the "Frank Statement to Cigarette Smokers" in 1954 and continuing to the present date. In these statements, defendants represented, among other things, that they would aid and assist in research concerning the safety of tobacco use and would provide complete and objective information about smoking and health. Compl. ¶ 314. In issuing these statements, the Funds contend, defendants voluntarily assumed a special duty to conduct such research and disclose complete and truthful information. Compl. ¶ 315. By failing to disclose their research results and/or by disseminating false, incomplete and misleading representations about tobacco use, defendants allegedly breached this assumed special duty. Compl. ¶ 316.

 Defendants argue that New Jersey has never recognized the imposition of liability for the breach of a voluntarily assumed special duty. Tr. at 50; Pl. Br. at 31–32. This court does not agree. The *Restatement (Second) of Torts* § 323 describes the breach of a special duty as follows:

> One who undertakes ... to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

*Restatement (Second) of Torts* § 323 (1965). While New Jersey courts have never explicitly adopted the provisions of section 323, they have recognized a similar theory of liability. *First State Bank of Hudson County v. United States*, 599 F.2d 558, 565 n. 7 (3d Cir.1979) (discussing New Jersey law), *cert. denied*, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980). Under New Jersey law, one who voluntarily undertakes to render a service to another is liable if he or she renders such service without exercising reasonable care. *See Bauer v. 141–149 Cedar Lane Holding Co.*, 24 N.J. 139, 149, 130 A.2d 833 (1957) (rejecting the *Restatement* restrictions of increased risk or reliance by plaintiffs as "controlling" factors and adopting a "reasonableness" test to determine liability for the voluntary assumption of a duty); *Freddi–Gail, Inc. v. Royal Holding Corp.*, 45 N.J.Super. 471, 475, 133 A.2d 362 (App.Div. 1957) (citing *Bauer* as "put[ting] on a strong footing [New Jersey] law respecting volunteers"), *certif. denied*, 25 N.J. 56, 134 A.2d 833 (1957); *see also Merklin v. United States*, 788 F.2d 172, 174 (3d Cir.1986) (noting that New Jersey law imposes a duty that one who voluntarily takes on a service not do so negligently); *Titus v. Lindberg*, 49 N.J. 66, 74, 228 A.2d 65 (1967) (once party assumed responsibility for supervising school grounds, party was legally obligated to exercise due care).

 Wholly aside from whether physical harm is required to maintain this cause of action,[21] the important question is whether,

---

**21.** Defendants also argue that the Funds' breach of a special duty claim must be dismissed because the Funds have not suffered physical harm. Def. Br. at 33. This court need not reach that issue because the Funds' special duty claim will be dismissed on other grounds. It appears, however, that, under New Jersey law, physical harm may not be required. In *Bauer*, the Supreme Court of New Jersey alluded to the physical harm requirement but did not reach the issue because it found that defendant acted reasonably and did not breach its duty. The Court, however, noted that New Jersey common law does not require physical harm. *See Bauer*, 24 N.J. at 147, 130

A.2d 833 (noting that "[i]t would also appear that the Restatement has limited the application of its rule to 'bodily' injury while the [New Jersey] common-law rule is not so limited.") (citing to *La Brasca v. Hinchman*, 81 N.J.L. 367, 79 A. 885 (Sup.Ct.1911)). Subsequent New Jersey caselaw has not definitively addressed the physical harm requirement and, given this court's finding that no special duty was assumed toward the Funds, this court need not attempt a prediction. *See First State Bank of Hudson County*, 599 F.2d at 565 n. 7 (noting uncertainty of law in New Jersey).

by issuing the "Frank Statement" and subsequent statements, the defendants assumed a special duty toward the Funds to perform research and to disclose complete information to them. This court finds that by simply issuing the public statements referenced in the complaint, the defendants did not assume such a duty. Parenthetically, those same statements have previously been rejected in the context of creating a duty to warn of the dangers of smoking. *See Cipollone v. Liggett Group, Inc.,* 683 F.Supp. 1487, 1495 (D.N.J.1988) ("Plaintiff contends, however, that defendants, by making affirmative statements regarding smoking and health, undertook a duty to warn plaintiff of the hazards of smoking. The court rejects this theory, concluding that the New Jersey Supreme Court would not apply Restatement (Second) of Torts § 323 to plaintiff's failure to warn claims."); *see also Gunsalus v. Celotex Corp.,* 674 F.Supp. 1149, 1157 (E.D.Pa.1987) (finding that as a matter of law "[n]either the Tobacco Institute's corporate purposes nor the American Tobacco Company's general statements in advertising constitute an assumption of a duty to plaintiff to perform research and inform him of all dangers of cigarette smoking[ ]"). The Funds have not provided this court with a single case from New Jersey or elsewhere, nor has this court been able to find one, which has held that a special duty could be created by a company's general public statements or that failure to comply with corporate purposes or promises made in advertising could constitute the breach of a special duty. *Cf. Steamfitters,* 1998 WL 212846 at *3 (citing to *Gunsalus,* 674 F.Supp. at 1157, and noting that advertising statements cannot give rise to a special duty); *Texas v. The American Tobacco Company,* 14 F.Supp.2d 956, 973 (E.D.Tex. 1997) ("Although Texas courts have adopted § 323 of the Restatement as a basis of liability, they have not extended it to create a duty based upon corporate statements or advertising.").

▮▮▮ Even if a "special duty" to disclose information was created by defendants' public pronouncements, it was a duty to consumers of tobacco products and not to the Funds. The Funds may not recover for breach of a duty which was assumed for the benefit of another or for breach of a duty voluntarily assumed on behalf of the public generally. *Laborers Local 17,* 7 F.Supp.2d at 293. The complaint does not allege one statement made to or directed at the Funds, and the 1954 "Frank Statement" is specifically directed "to Cigarette Smokers." Compl. ¶ 91. Furthermore, Count VII does not even allege that the Funds were "intended beneficiaries" of the defendants' undertaking to conduct and disclose their research. *See Laborers Local 17,* 7 F.Supp.2d at 293 (assumed duty "does not extend to third parties who were not the intended beneficiaries of the subject undertaking") (quoting *Jansen v. Fidelity & Cas. Co. of New York,* 165 A.D.2d 223, 226, 566 N.Y.S.2d 962, 964 (3d Dept. 1991), *aff'd,* 79 N.Y.2d 867, 581 N.Y.S.2d 156, 589 N.E.2d 379 (1992)); *City and County of San Francisco v. Philip Morris, Inc.,* 957 F.Supp. 1130, 1143 (N.D.Cal.1997) ("the extent to which the transaction was intended to affect the plaintiff" is a factor in deciding whether to recognize a special duty in a particular case).

Moreover, unlike Count VI of the complaint, in which the Funds allege an intent to defraud them, Compl. ¶ 307, nowhere in Count VII do the Funds allege that defendants intended to undertake to render a service to the Funds. And, of course, repeated allegations that the Funds' relied upon defendants' statements, Compl. ¶ 315, do not establish defendants' intent to undertake a service for the benefit of the Funds as opposed to consumers. To allow a public pronouncement to form the basis for a "special duty" would create a quagmire of tort liability and negate the duty requirement of negligence-based tort liability. *See Laborers Local 17,* 7 F.Supp.2d at 293 ("If any member of the public could allege a special duty on the basis of general public statements, liability would be 'unduly and indeed indefinitely extended by this enlargement of the zone of duty.'") (quoting *H.R. Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 168, 159 N.E. 896, 899 (1928)). This court cannot endorse such a result and, therefore, Count VII will be dismissed.

### E. *Unjust Enrichment*

■ Finally, the Funds' claim of unjust enrichment (Count XI) will also be dismissed because the Funds have failed to show that defendants unjustly received a benefit at the Funds' expense. "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *See VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994).

■ The Funds allege that they have paid, and continue to pay, the medical expenses incurred by their participants for the treatment of tobacco-related diseases that defendants should have had to pay. Compl. ¶¶ 347–48. The Funds are wrong. They paid the medical expenses for participants pursuant to their statutory obligation to hold in trust the contributions of employers "for the exclusive purpose of providing benefits to participants in the [trust] and their beneficiaries." ERISA, § 403(c)(1); 29 U.S.C. § 1101(c)(1). The argument that the Funds conferred a benefit on defendants because the defendants may ultimately be found liable for the medical costs that the Funds have already paid, Pl. Opp. Br. at 39, is simply too remote and speculative to constitute a recoverable benefit. Every other court to reach this issue has agreed. *See, e.g., Oregon Laborers–Employers,* slip op. at 24–25 (dismissing union health funds' unjust enrichment claim because no benefit conferred to defendants); *Seafarers,* slip op. at 31 (same); *Southeast Florida Laborers,* 1998 WL 186878 at *4 (same); *Laborers Local 17,* 7 F.Supp.2d at 287 (dismissing unjust enrichment claim because benefit conferred was "too speculative"); *see also Steamfitters,* 1998 WL 212846 at *4 (dismissing unjust enrichment claim as a disguised subrogation claim).

Count XI will be dismissed.

### II. *Defendants' 12(b)(7) Motion*

■ Having denied defendants' motion to dismiss the Funds' direct claims of fraud and civil RICO, this court must now consider defendants' alternate motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(7).[22] Defendants argue that this action should not be permitted to proceed in the absence of the individual participants, their employers, and the insurers that paid benefits to certain participants. This court disagrees.

Fed.R.Civ.P. 19(a) states that a person whose joinder will not deprive the court of jurisdiction "shall be joined as a party" if

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). Fed.R.Civ.P. 12(b)(7) provides for dismissal based on "failure to join a party under Rule 19."

Defendants do not argue that Rule 19(a)(1) applies nor does this court believe that it is applicable. Given the posture of what little remains here—namely, claims alleging fraud aimed at the Funds themselves as opposed to their participants or the public at large—the absence of the participants, employers and insurers will not prevent complete relief "among those already parties." Rule 19(a)(1). Claims by the Funds for their direct financial injury will not preclude efforts by any other party to vindicate their rights at a later date.

But, argue the defendants, invoking Rule 19(a)(2), absent joinder (or preferably dismissal) they face a substantial risk of multiple recovery and improper claim splitting. Rule 19(a)(2), however, is contingent upon an absent party "claim[ing] an interest relating to the subject matter of the litigation." Fed. R.Civ.P. 19(a)(2); *see also ConnTech Dev. Co. v. University of Conn. Educ. Properties,*

---

**22.** Defendants submit that if the court is not inclined to grant defendants' motion at this time, the court defer ruling on the motion until discovery has been completed. Def. 12(b)(7) Br. at n.

1. This court declines to so defer because, given the nature of the discrete and narrowly tailored remaining claims, this court cannot see how discovery would alter this court's analysis.

*Inc.,* 102 F.3d 677, 682 (2d Cir.1996) ("Subparts (i) and (ii) of Rule 19(a)(2) are contingent ... upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action.") (citation omitted); *M.C. By and Through Mrs. C. v. Volumtown Bd. of Educ.,* 178 F.R.D. 367, 370 (D.Conn.1998) ("Under the impair or impede clause, however, the absent party itself must assert an interest in the subject matter of the pending case.") (citation omitted). Again, the subject of what remains of this litigation is the direct financial injury suffered by the Funds resulting from the defendants' fraudulent behavior directed specifically at the Funds. Because neither any participant, nor any insurer nor any employer has claimed—or could claim—an interest in the subject of this litigation as it is now defined, they cannot be deemed necessary parties for purposes of Rule 19(a)(2).[23]

Defendants' 12(b)(7) motion to dismiss for failure to join a party under Rule 19 will be denied.

### III. *Conclusion*

For the foregoing reasons, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) will be granted in part and denied in part. Only Counts I, II and VI remain and they remain only insofar as they allege misconduct directed at and relied upon by the Funds. Given the narrow tendril of claims that have survived, defendants' alternate motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(7) will be denied.

Finally, returning to where this court began, the Funds are directed, within fourteen days of the date of this opinion and order, to file an amended complaint, amending the "behemoth" 124–page, 350–paragraph complaint to set forth only those claims that, consistent with this opinion, remain and only the relevant underlying facts.

---

23. As neither the participants, the employers nor the insurers qualify as necessary parties under Rule 19(a), this court need not reach Rule 19(b) and the issue of "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed[.]"